610

F. C. CAWTHON, JR., Plaintiff-in-Error, v. R. C. MAYO, Defendant-in-Error. —325 S. W. (2d) 629.

Western Section. December 31, 1958.

Dissenting opinion January 8, 1959.

Certiorari denied by Supreme Court June 5, 1959.

612

Waldrop & Hall, Jackson, Willard Smith, Henderson, for plaintiff in error.

Lloyd Tatum, Henderson, for defendant in error.

AVERY, P. J. (Western Section). This is a suit for personal injuries and expenses resulting from an automobile collision which occurred on the 7th day of May, 1956, by and between the automobiles driven by R. C. Mayo, plaintiff below and referred to by that designation in this Opinion, he being defendant-in-error here, and F. C. Cawthon, Jr., defendant below and referred to by that designation herein, he being plaintiff-in-error here.

This accident occurred on Highway 45 in Madison County, Tennessee, which highway is 22 feet in width, at the crest of an elevation. At the time of the accident plaintiff was traveling north on his way to the Jackson-Madison County General Hospital to visit his wife who had, with the plaintiff, been injured in another automobile accident shortly prior thereto. He was traveling behind two motor vehicles, the front one being a pick-up truck and the one immediately in front of him is referred to as a maroon Plymouth.

The defendant was traveling in a southerly direction, followed immediately by Mr. Purnell in his car. The center vehicle of the three traveling north pulled out to the left to pass the pick-up truck just as he was reaching the crest of the hill where he could be seen by the vehicles traveling south. The defendant, being the front of the duo traveling south was faced with this oncoming automobile in his driving lane and immediately pulled his car to the right going onto the shoulder of the road to avoid the head-on collision, lost control of his automobile which came back onto the highway and in crossing it, while still out of control, immediately in front of the automobile driven by plaintiff, the right front portion of plaintiff's car collided with the right side of defendant's car approximately in the center thereof, and in this collision plaintiff was injured, which injury gave rise to this suit.

The declaration is in two counts, one alleging unsafe and excessive speed; driving to the left of the center of the highway; coming over on the lane of traffic provided for northbound vehicles; failing to keep his vehicle under proper control; and in failing to keep and maintain a proper lookout. It then describes the injuries plaintiff received.

The second count adopts all of the descriptive and inducing portions of the foregoing first count, and alleges reckless driving, specifically violation of T. C. A. sec. 59-815 requiring a driver to use the right half of the highway; Section 59-823 requiring vehicles upon marked highways to travel in a single lane and not depart therefrom until the driver has ascertained that such movement can be made with safety; Section 59-852 which fixes the maximum speed limit of 65 miles per hour in the day; and Section 59-858 condemning willful or wanton disre-

gard for the safety of persons or property in the driving of an automobile.

A not guilty plea was filed by the defendant to the entire declaration.

The case was tried to a jury in the Circuit Court of Chester County, Tennessee, Honorable Andrew T. Taylor, Judge, presiding, resulting in a verdict in favor of plaintiff in the amount of $4,000. Motion for new trial by defendant was seasonably made, overruled and appeal in error prayed, granted, and perfected to this Court by defendant below, where errors have been assigned.

The substance of the errors assigned, where not set out in full, are as follows:

I

No material evidence to support the verdict.

II

The Court erred in refusing to grant a directed verdict in favor of defendant at the conclusion of all the proof, because the uncontradicted proof showed that the accident was the direct and proximate cause of the driver of the maroon Plymouth automobile in his effort to pass a pick-up truck, so that a head-on collision would have occurred with defendant's car if he had not avoided it by pulling off on the shoulder of the road and that the evidence on this point was such that the minds of reasonable men could not disagree upon the fact that a sudden emergency for the defendant was created and that he acted as a reasonable person would, and therefore was guilty of no negligence.

## III

That the Court erred in refusing to charge defendant's special request No. 2 as follows:

"Gentlemen of the Jury, I charge you that proximate cause is not necessarily that which is next or last in time or place, but that which is a procuring, efficient and predominant cause. Closeness in causal relation, rather, is the meaning."

## IV

That the Court erred in failing to charge defendant's special request No. 3 as follows:

"Gentlemen of the Jury, I charge you that where one is suddenly and unexpectedly placed in a perilous situation, if he acts according to his best judgment in the emergency thus arising, he is not chargeable with negligence, even though he might have pursued a wiser course and one that would not have resulted in injury."

## V

That the Court erred in failing to charge defendant's special request No. 5 as follows:

"I charge you further, gentlemen of the jury, that it is a well settled rule in our jurisprudence that one who, through the negligence of another, and not through his own negligence, finds himself in a position of peril, and is compelled to act instantly to avoid an injury, is not guilty of negligence if he makes such choice as a person of ordinary prudence placed in such position might make, even though he did not make the wisest choice."

## VI

That the Court erred in failing to give in charge to the jury defendant's special request No. 7 as follows:

"Gentlemen of the Jury, I charge you further that under these circumstances, and in a fair and reasonable corelation of all the surrounding circumstances as they appeared to the defendant, tends to the conclusion that the sole and proximate cause of the collision was the negligence of the driver of the maroon car, and that the defendant, under these circumstances, was not guilty of negligence, in the manner in which he attempted to meet and cope with the emergency and perilous situation with which he was suddenly confronted, and your verdict should be for the defendant."

## VII

The verdict is so excessive as to indicate it was the result of passion, prejudice or unaccountable caprice on the part of the jury.

## VIII

The Court erred in failing to declare a new trial on motion of defendant because of the prejudicial argument of counsel for plaintiff in the following words:

"There is no reason to cut down on the amount, don't worry about collecting it, you leave that to me, I will collect it."

It is insisted that this was error because the Court failed to move on the motion, failed to admonish plaintiff's attorney, and failed to instruct the jury to disregard his statement.

## IX

The Court erred in failing to grant defendant a new trial upon the reasons set forth in the 4th, 5th and 6th grounds of his motion for a new trial, because of the alleged error of counsel for plaintiff in making an argument flagrantly showing that defendant carried liability insurance, and that the question of defendant's insurance was discussed by the jurors during their deliberation.

The Assignments of Error related to the trial of this case and based upon the facts revealed by the record, pose the following questions:

(1) Was the Court in error by refusing to charge the special requests of the defendant as hereinbefore set out?

(2) Did the Court err by refusing to grant defendant's motion for directed verdict at the conclusion of all the proof?

(3) Is the verdict so excessive as that it shows the jury was motivated by passion, prejudice, sympathy, caprice, etc.?

(4) Is there any reasonable proof in this record or reasonable inferences to be drawn therefrom, on which the minds of reasonable men might differ as to the proximate negligence of defendant alleged in the declaration?

In our determination of question No. 1, we must consider it from the fact that this record is perfectly clear that:

(a) defendant was faced with a perilous emergency by the deliberate negligence of a third party,

which would require any person of normal intelligence to begin the action which defendant took; and

(b) it is just as clear from all the proof that plaintiff is guilty of no negligence of any character or degree contributing to the injury which he received.

The record so conclusively showing, we must examine the Charge of the Court upon the question of sudden peril or emergency, and subsequent action of defendant resulting therefrom, and his explanation of proximate cause.

██ The learned Trial Court explained the theories of plaintiff and of defendant in accord with the allegations of negligence in the declaration and the plea thereto, and when he came to the question of sudden emergency, he said:

"Now in this case the rule of law known as the Doctrine of Sudden Emergency has been raised by the defendant Cawthon, that is, that the defendant at the time this collision occurred was operating his vehicle in a sudden emergency. Now whether or not there was a sudden emergency is a question of fact which you are to determine. If you determine there was a sudden emergency existing, it is my duty to tell you how to apply the law with reference to this doctrine of sudden emergency. The law is that an automobile driver who, by the negligence of another and not by his own negligence, is suddenly confronted with an emergency and is compelled to act instantly to avoid a collision or injury, then such driver is not guilty of negligence, if he makes such a choice as a reasonably prudent person placed in such a position might make, even though he did not make the wisest

choice, but the driver of an automobile can not successfully invoke the sudden emergency rule just stated where his own negligence created or contributed with the negligence of another to creat an emergency, so in connection with the doctrine of sudden emergency, you have these questions: First, to say whether or not in this case the defendant was confronted with sudden emergency, and if you find that sudden emergency existed, then you go a step further and say whether or not the defendant was guilty of negligence that created or contributed to create that emergency. If you find from the evidence that his negligence caused or contributed with the negligence of another to cause the emergency, then the defendant, under our law, would not be entitled to the benefit of the doctrine of sudden emergency. On the other hand if the defendant was guilty of no negligence himself in creating that emergency, if up until the time of sudden emergency arose he was guilty of no negligence, then that doctrine would be applicable to the defendant, and if the defendant exercised his best judgment after the sudden emergency arose and made such a choice as a reasonably prudent person placed in such position might make, then, although he violated the common law or violated the state statute which he is alleged to have violated, then he would not be guilty of negligence.''

At the conclusion of his Charge, the Court inquired of counsel: ''Is there anything further, gentlemen?'' The record does not show the response of counsel except as explained by the Court in the following language:

"Ladies and gentlemen, plaintiff and the defendant have passed to the Court some requests for special charges, the Court is of the Opinion that some of these special requests should be given to you as the law of the case, these special requests, however, should not be given any more weight or credit than any other part of my instructions. In other words, the fact that I give to you any special requests does not mean that you should attach any more importance to it than if I had given these special requests along with it as part of my original instructions.

"I charge you if you find from all of the evidence in the case that the defendant, F. C. Cawthon, was driving his automobile in a proper and ordinary manner prior to the said accident, and if you find that the driver of the maroon car pulled out to pass the truck immediately in front of the defendant, and that the defendant in order to avoid an accident, applied his brakes and pulled his vehicle to the shoulder of the road, and in so doing, the collision for which the plaintiff sues occurred, and that the proximate cause of the accident was that of the driver of the maroon car, then your verdict should be for the defendant in this case.

"If you find that the defendant Cawthon was driving his automobile at a rate of speed greater than a reasonably prudent man would drive under the same or similar circumstances, having due regard to the traffic conditions and the condition of the road, then the defendant would be guilty of negligence, even though he may not have been violating the statutory speed limit of the State of Tennessee.

"If you find that the defendant was faced with a sudden emergency as previously defined to you, and that after said sudden emergency no longer existed, then if the defendant then committed an act of negligence which was the proximate cause of the accident, then in that event you would find for the plaintiff.

"I am going to read one more special request to you again and add something to it: I charge you further that if you find from all of the evidence in the case that the defendant F. C. Cawthon, was driving his automobile in a proper and ordinary manner prior to the said accident, and if you find that the driver of the maroon car pulled out to pass the truck immediately in front of the defendant, and that the defendant, in order to avoid an accident, applied his brakes and pulled his vehicle to the shoulder of the road, and that he, himself, was not guilty of negligence, and in so doing, the collision for which the plaintiff sues occurred, and that the proximate cause of the accident was that of the driver of the maroon car, then your verdict should be for the defendant in this cause."

It is apparent from the Charge of the Court that these last four paragraphs above quoted constitute and are the special requests offered by both the plaintiff and defendant, but there is nothing in the record to definitely show which special requests were offered by the respective parties.

In the motion for a new trial by defendant, it is alleged that the Court erred in failing to charge defendant's special requests numbered 2, 3, 5, and 7, which would

indicate that he did charge defendant's special requests numbered 1, 4, and 6, but these special requests 1, 4, and 6 are nowhere shown in the record and there is no way to specifically determine whether the Court charged special requests 1, 4 and 6 of defendant in the language of the proffered requests or not. Neither does the record show any specific requests by plaintiff except in the statement of the Trial Court, but from the verbiage used in this part of the Charge of the Court embodying special requests it is evident that he did charge requests of both parties.

Assignments of Error IV and V, respecting the error of the Court in failing to charge the specific requests relating to sudden emergency constitute correct statements of what we understand the law to be, but we think when consideration is given to the entire Charge of the Court, it can be determined therefrom,—though not in the same verbiage, the Court fairly explained this doctrine of sudden emergency and discovered peril to the jury in accord with the authorities insisted upon by defendant, which are: Smith v. Fisher, 11 Tenn. App. 273, 274; Grigsby & Co. v. Bratton, 128 Tenn. 597, 163 S. W. 804; Power Packing Co. v. Borum, 8 Tenn. App. 162;

and also in accord with the research we have made on that doctrine.

To elaborate on the question of sudden emergency and the care required under such circumstances, would necessitate a discussion of existing peril, last clear chance, and would extend this Opinion unnecessarily. Suffice it to say, as was said by the late distinguished Judge Anderson of this Court, in the case of Western Union Telegraph Co. v. Dickson, 27 Tenn. App. 572, 173 S. W. (2d)

714, 719, which we quote not only in support of our position as it relates to Assignments of Error IV and V, but also to Assignment III with respect to properly charging the definition of proximate and remote causes:

"(12) 'The proximate cause of an injury', said the Court in Deming v. Merchants' Cotton-Press & Storage Co., 90 Tenn. 306, 353, 17 S. W. 89, 90, 99, 13 L. R. A. 518, 'may, in general, be stated to be that act or omission which immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, which had it not happened, the injury would not have been inflicted.'

"However, the ' "proximate cause" is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning.' Grigsby & Co. v. Bratton, 128 Tenn. 597, 603, 163 S. W. 804, 806.

"(13) The 'remote cause' of an injury is defined to be 'that which may have happened, and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened.' Anderson v. Baltimore & O. R. Co., 74 W. Va. 17, 81 S. E. 579, 581, 51 L. R. A., N. S., 888, 892; note, 36 Am. St. Rep. 807.

"(14) This definition of the remote cause of an injury was approved by this Court in Elmore v. Thompson, 14 Tenn. App. 78, 100, and also in Phillips-Buttorff Mfg. Co., McAlexander, 15 Tenn. App. 618. In the same cases the Court quoted with approval from 2 Blashfield's Cyclopedia of Automobile Law, sec. 4, p. 1194 as follows: 'There is a distinction

between an unlawful or wrongful act which is at least a contributing cause of the injury sued for, and one which is merely an attendant circumstance or condition, though perhaps a necessary condition of the acts resulting in such injury. An event may be one without which a particular injury would not have occurred; yet if it was merely the condition or occasion affording opportunity for other events to produce the injury, it is not the proximate cause thereof.' Blashfield, supra, p. 1194; Id. (Perm. Ed.), sec. 2535.

"(15) In those cases the Court also took occasion to reiterate that 'the inquiry as to what is the proximate cause of an injury, like that of negligence, is always for the jury, unless the determinative facts are undisputed and are reasonably susceptible of but one inference.'"

Assuming at this stage of the Opinion that the Trial Court did not err in failing to direct a verdict favorable to defendant on his motion made at the conclusion of all the proof, which will be considered hereinafter, we think there was a sufficient charge with respect to the legal definition of proximate cause and the sudden emergency rule. What we mean now to say is that if the learned Trial Judge was correct in refusing to direct a verdict, his charge relative to the doctrines referred to in this paragraph is fairly sufficient. We should at least apply T. C. A. sec. 27-117, for we feel fairly certain that the action of the Court attacked by these Assignments did not affect the verdict of the jury. Thus, we are constrained to and do overrule Assignments of Error III, IV and V.

■ All that is necessary to say with respect to Assignment of Error VIII, which attacks the action of the Court in failing to rule on a mere suggestion made by counsel for defendant with respect to improper argument by counsel for plaintiff, is that when that remark was made there was no motion by counsel for defendant for a mistrial, for instructions to the jury, to disregard the statement, nor anything which would call for affirmative action of the Court. All that counsel for defendant said, as shown by this record, in regard to the statement of counsel for plaintiff under attack, was simply:

"If Your Honor please, we believe that is an improper statement to the jury."

In Assignments of Error VII and IX it is insisted that the verdict is so excessive as to indicate that it is the result of passion, prejudice or unaccountable caprice on the part of the jury, and that this alleged excessive amount of the verdict was brought about "by the determined and flagrant presentation of the fact or inference that defendant carried liability insurance", and that the remarks by counsel for plaintiff in closing his argument as set forth hereinbefore, gave emphasis to this excessive verdict, or in other words caused the verdict to be excessive.

Again, we say that if the Court was correct in overruling defendant's motion for a directed verdict at the conclusion of all the proof, we see no error on the part of the Court as attacked by these Assignments VII, VIII and IX. The jurors were examined on the question of motion for new trial and their testimony appears in the record along with statements of counsel for defendant. The record reveals that the learned Trial Court gave the

defendant opportunity to present as many of the jurors as was necessary and proper, so after defendant had introduced jurors Williams and Maness, the Court said to counsel for defendant—"Do you want to call one more?" and the following ensued:

"Mr. Smith: Yes, sir, well I want to tell you I'm shooting in the dark, there was only about three of them that I talked to about the case, if I am just going to be limited to one more, I would like to talk to a couple of others.

"The Court: The only thing, I just don't want to hear all twelve of them.

"Mr. Smith: Well I don't have all twelve. If Your Honor would allow me to talk to—I hadn't talked to Mr. Maness, I think I could expedite it.

"The Court: Alright.

"Mr. Smith: Your Honor please, after discussing the matter, we think the calling of any additional jurors would merely be cumulative and would not add anything for the Court."

Without entering into discussion of what the appellate courts have said about the mentioning of insurance by jurors during their deliberation and by counsel for the plaintiff in questioning witnesses or any remarks by them to the jury, suffice it to say that these three witnesses simply made reference to casual remarks by some member of the jury about insurance and all of them stated that it had no effect on their verdict whatever. Jurors are generally sympathetic with the injured parties, and since this plaintiff's wife was in hospital with injuries from a prior automobile accident, the jurors in this case

were very likely overly sympathetic with the injured plaintiff, and though their verdict is rather puzzling to understand we hardly think we should say they acted fraudulently.

Therefore, Assignments of Error VII, VIII and IX are overruled.

We will now give consideration to Assignments of Error I, II and VI.

With reference to Assignment VI, while it quotes a special request and alleges the failure of the Court to give that request in charge to be an error of the Court, that request, had the Court charged it, would have been no more nor less than directing a verdict for the defendant.

We are always mindful of the fact that in determining whether or not a verdict should be directed by the Trial Court, and when considering a jury verdict, we must take into consideration the evidence supporting plaintiff's charge of negligence against the defendant, discarding and disregarding all countervailing evidence, and if there be any reasonably substantial evidence supporting the charge of negligence of defendant, or any reasonable inference to be drawn therefrom, the Trial Court should not direct a verdict. Likewise, a jury verdict is not to be disturbed if there is any reasonably substantial evidence to support it. The proper answer to the posed question No. 4, set out on page 5 hereof, must be determined by concluding whether or not the evidence and the physical circumstances of the case for plaintiff are sufficient in point of law and reason for the learned Trial Judge to exercise his authority to direct a

verdict for defendant or let the case go to the jury. Coatney v. Southwest Tenn. Elec. Membership Corp., 40 Tenn. App. 541, 292 S. W. (2d) 420; Lackey v. Metropolitan Life, 30 Tenn. App. 390, 206 S. W. (2d) 806; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450, 452; Western Union Telegraph Co. v. Dickson, 27 Tenn. App. 752, 173 S. W. (2d) 714, 719.

More aptly said by Judge Felts of this Court in Spivey v. St. Thomas Hospital, supra [31 Tenn. App. 12, 211 S. W. (2d) 452]:

"And in so deciding, we must look to all the evidence, construe it most favorably to plaintiff, take as true that which tends to support her right, discard all countervailing evidence, and from the rest of it allow all reasonable inferences to uphold the verdict."

Neither are we concerned with a preponderance of the evidence nor whether there is evidence to have supported a verdict for defendant had such been rendered.

We are further mindful of the fact that the defendant is only required to use such reasonable care in the operation of his automobile as the exigencies of the circumstances demand of him,—that degree of care attributable to a person of ordinary intelligence and skill.

In the operation of a motor vehicle the driver is required to operate it in such a manner and at such a speed as is consistent with ordinary care, and if he is operating it in such a manner and at such a speed as a reasonably prudent person would not do under the same or similar circumstances, and such operation results in an injury to another person or damages to property of

another person, who is in no wise at fault, he is guilty of negligence even though he is not violating any particular rule of law which we know as the common law or an ordinance of the City or "Law of the Road" of the State.

■ Let us examine, therefore, the statements of the plaintiff as related to and supporting the physical facts, as hereinbefore and hereinafter referred to, in our effort to weigh them in the light more calculated to prove or give rise to a reasonable inference of negligence on the part of defendant. In so doing we are not going to incorporate all the questions but will correlate some of the statements made by plaintiff in his answers to questions and where better understandable we will quote the questions also. He said that the highway at the point of the collision was "approximately twenty feet" wide, with a center line; that at the time he was moving up a slight upgrade and that he could not "see a far distance ahead" and he fixed that distance a good bit "over 100 yards"; that it had rained that morning but the rain had stopped at the time of the accident; that the pavement and the shoulders were somewhat wet. He describes the shoulders on the west side of the road: "I think it had been not too long ago that some dirt was put there, it looked soft, I know on my side it was soft because I looked at it" and that the west shoulder "is about half as wide as the road"; that the west shoulder "wasn't good firm solid ground". He said he had been driving that morning prior to the collision around 40 miles per hour and that at the time there were two vehicles in front of him at a distance he guessed would be about 100 yards, traveling in the same direction. After these explanations and on direct examination, he was asked and answered:

"Q. Tell what happened, if anything, when you were following these other two cars north on the highway, just describe to the jury what occurred? A. I saw a second car, I don't remember what it looked like, color or anything, but I saw it pull out and cross the yellow line— * * * And it seemingly was right up behind the truck and it pulled out and when it pulled out I said to myself, that crazy driver, and begin to slow down even then, and then just almost right on that I saw the car coming up fast on the other side of the hill, just see it, it looked at that distance it was going fast, the other fellow started to kind of pull back to get around that truck, and then is when I cut my speed to almost nothing and then stopped and this car went off of the highway—

\* \* \* \* \* \*

I was sitting there and was sort of pulling for him because I saw his car was in a bad shape going this way and that way and not thinking I was figured in it anywhere, and then the next thing I knew there he was coming right toward me sidewise and hit me.

\* \* \* \* \* \*

It was on the east of the highway within about the edge of the thing, I pulled over just as far when I stopped to keep from getting on the dirt, muddy shoulder.

"Q. How far, from the time he got back on the road, did he travel, to the best of your estimation, before his car and your car collided? A. Mr. Tatum, that is not too easy to say because the first thing I knew that he was on the road and coming at me side-

ways clear across the road, and it seemed like he was on me just like that (snap of fingers), but I think it must have been fifty feet or something like that, it just came so suddenly and unexpectedly until that all I do know I had a picture of how he came across sort of sidewise and hit me.

"Q. Brother Mayo, the first time that you noticed and saw this car driven by this defendant, about how fast would you say it was going? A. The first time I saw I couldn't tell because he was just coming over the crest of the hill, but I had the impression that it was fast and the reason I got that impression is the way he went off the highway so quick and when he hit the highway he begin to do just like a car being driven awfully fast would do, in that soft dirt and when as he came on down there and came across and hit me, I think I would have to say that he was going at least 65 or more, and I say part of this because of something that he told me afterwards.

"Q. Would you estimate that he was going 65 or that he was going more than 65? A. I think he must have been going more than that, he had told me afterwards that he—that when he got past some obstruction up there and he said he was going about 60 miles an hour and when he got passed that he picked up some speed, he had been held down by part of the road being worked on."

He identified three photographs and filed them as Exhibits numbered 1, 2 and 3, to his evidence.

"Q. Describe what he was doing, if anything, from the time when he was over on the shoulder of the road over there, what he was doing, if anything, to

bring his car out of the position that he was in going across the highway toward the east? A. Well, I couldn't tell exactly, but all I know he was doing was wrestling with the steering wheel, and I think the car came—I thought it slipped, slipping sidewise, I don't know, it was coming on me so fast.

"Q. It appeared to you to be slipping or skidding in other words, was the front end facing in a— A. (interrupting) I am not too sure it was doing that, it may have been just coming, but with me this way the car was coming at me like that (indicating with hands), across that way.

"Q. In a skidding manner? A. Yes, sir.

"Q. Was sliding in other words? A. Yes, sir, and out of control any way, I'm sure."

The three photographs exhibited by him were shown to have been made of the two automobiles sitting in the same position that they were at the time they stopped after the collision. Photograph No. 1 shows a store building which is on the east side of the highway. Defendant's car sitting across the side ditch, with the front part on the bank and the rear on the east shoulder of the highway. The plaintiff's car is shown sitting practically across the entire east lane of the highway with the rear slightly over the center line of the pavement. This picture shows the left side of each of the cars and the view of the highway is toward the south, with two stripes in the center of the road, one of which the proof shows to be a yellow stripe, and these two stripes extend in both directions from where the cars are located. This picture shows the opposite side of the cars from that on which the impact to each occurred.

Photograph No. 2 is a closer up scene with camera facing the same direction as in picture No. 1. Photograph No. 3 is a photograph made with the camera facing in an opposite direction from exhibits No. 1 and No. 2, and this exhibit No. 3 shows the damages to each car caused by the impact. Photograph exhibit No. 1 shows the pavement and highway in the direction from which defendant had come. In other words, that part of the pavement shown from the bottom of the photograph to where the two cars in question came to rest was traveled by the pick-up truck and the maroon Plymouth after the defendant had pulled on to the west shoulder of the road to avoid a head-on collision with the maroon automobile. So that not only the evidence of the plaintiff but the physical facts as shown by these photographs he has introduced and made a part of his evidence, are conclusive of the statement made by the plaintiff that the maroon automobile pulled across the center or yellow line in violation of the law of the road in its effort to pass the pick-up below the crest of the rise where these two automobiles came together just before plaintiff reached the crest.

Looking again at exhibit No. 1 of plaintiff and applying the physical appearance thereof to statements made by plaintiff in his behalf and certainly shown by other proof in the record, there appears to be skid marks along the shoulder of the road, some of which are slightly on the pavement at the southernmost end made by defendant's car near an electric light pole and a short distance from where the cars collided.

On cross-examination, after many preliminary questions, he was asked and answered:

"Q. And then which did you see first, the car driven by the defendant Cawthon coming over the hill or the car, which you were following, pulling out from behind the pickup truck? A. The car that pulled out from behind the pickup truck.

"Q. And what, if anything, did that car do that caused you to make the mental observation that 'that crazy driver'? A. He crossed the yellow line.

"Q. He got across over into a lane of traffic where he shouldn't have been? A. Yes.

"Q. Now then after you saw him cross over, with reference to his being over in that lane, what did you next see? A. You mean what other than he?

"Q. Yes, sir. A. Some car coming up just over the crest of the hill and it got up far enough to just where I could see it.

"Q. Now is that the car that you have since found out was driven by Cawthon? A. I have since found out, yes, sir."

He further stated that he had learned since the accident that this Plymouth automobile side-swiped the pick-up truck as it went by it. He was then asked and answered:

"Q. Now then, describe if you will to the jury the action of the Cawthon car as it came down the grade meeting this car that you were following? A. I guess the best I could say, by the time I had seen his car and there was a pending accident there, then is when I stopped it and I was sitting still, and the main thing I can say about it, naturally I saw he was off on that shoulder and was having trouble and I don't

know just what all he did, but I know he just didn't drive along straight like he was on the highway, going one way and the other.

"Q. He was getting off on the shoulder? A. Yes, I was thinking probably he would go on off over there and turn over.

\* \* \* \* \* \*

"Q. Now then do you remember making a statement to the highway patrolman substantially as follows: "It was the vehicle that pulled out that actually caused the accident"? A. I don't remember it.

"Q. You don't remember making it? A. Very frankly that was the first cause of it as anybody would know, when he pulled out, but I may have said it, but I don't recall, but to tell you the truth I was hurting and I don't remember too much of what I said.

\* \* \* \* \* \*

"Q. Haven't you, Brother Mayo, on more than one occasion here in town to various and sundry people, said that it was the car in front that caused it, it wasn't the boy's fault? A. May I tell you again what I told you awhile ago, if I did I said I was sorry, sorry about what happened to the boy and I have a pet peeve against people who cross yellow lines and violating the law.

"Q. And the person that crossed it violated the law? A. Yes, and that is the first cause. As to that I don't know the other mechanics and things that went into it, but I was sympathetic toward him."

Just before this witness finished his testimony, the Court asked him this question:

"The Court: Mr. Mayo, you may have answered this question, if you did I overlooked it. How long or how far would you say the Cawthon car rode along on the shoulder of the road on the west side of the highway, roughly, about how many feet?

"Witness: This is an estimate, but as seeing it afterwards and then from that picture seeing where it came back on, it had to be 100 feet or more, just might near had to be because of the crest of the hill to that post."

He had previously stated the distance to be much less than 100'.

The only other witness offered by plaintiff was Dr. John G. Riddler, who knew nothing about the facts of the collision except what he had been told, but did testify about plaintiff's injuries; and he also offered one W. E. Rhodes, a banker and insurance agent, by whom plaintiff undertook to prove the mortality tables applicable to a man of the age of the plaintiff, who was 65. The Court would not permit that evidence and the plaintiff closed his case.

█ The defendant, a Mr. Purnell who had driven some distance behind defendant immediately prior to the accident, and a highway patrolman testified for defendant. The undisputed testimony of the defendant and of Mr. Purnell is that the defendant had driven in a careful manner, within the speed law, at a rate from 50 to 60 miles an hour for about 8 miles and was so driving at the time he came to the crest of the rise, when the maroon

Plymouth pulled directly into the lane of traffic and headed straight toward him. Under the rules of the law by which we are governed in examining the record in this case on appeal, we may look to all the evidence and determine whether or not, the minds of reasonable men could differ based upon the entire record.

The proof of plaintiff, supported by all the proof of defendant, unmistakably shows that the defendant was exercising that degree of care which any reasonable person would exercise as he approached the point in the highway where the Plymouth came toward him head-on and in his lane of traffic. What else could a reasonable man do under the circumstances related by the plaintiff than that which defendant did? Had he pulled to his left he certainly would have gone head-on into the pick-up truck. He, therefore, had no alternative except to do that which he did and that which Purnell says he did, put on his brakes and take the shoulder of the road to the right which plaintiff says was soft and wet and that defendant's car wavered and twisted as it came down that shoulder of the road in that wet dirt, out of control, and came right down the road sideways into him. It is stated in the brief of counsel that:

"The plaintiff admits that the driver of the maroon Plymouth was guilty of negligence in crossing the yellow line, but he insists that this does not excuse the defendant his proximate negligence. The plaintiff had a right to sue either or both."

Counsel relies upon what he refers to as the excessive speed of defendant's automobile prior to the time he left the pavement and went on to the shoulder. His entire argument to the jury is in the record and in that argu-

ment and in his brief before us, as we understand his argument, he insists:

(1) That the jury could have found that defendant was guilty of driving his car at an excessive speed before he left the pavement;

(2) That this speed which he insists defendant was making before he left the pavement was the cause of him not having control of his car when he got on to the shoulder of the road.

And he makes this statement:

"The slower an automobile is driven, the easier it is to control, and if the defendant lost control he would not have had reasonable rate of speed."

(3) That the defendant was negligent in not keeping control of his car and proceeding on down the shoulder of the highway until he had cleared the point where plaintiff's car was located.

It is unquestionably true, and not subject to any kind of contradiction by this record nor from common reasoning, that the defendant was traveling in his proper lane of traffic or in his proper right of way when he was faced with this sudden emergency by an unlawful driver of another automobile. We do not mean to be understood as saying that because he was in his proper right of way, he could not be negligent, or that he would necessarily have been on the lookout ahead, or that because he was in his right of way he was relieved of the duty to exercise ordinary care. Care is a state of mind of an individual and whether it is proper care being exercised is a question to be determined from the circumstances and move-

ments that he makes, and whether or not he is in the right position in the first place.

Upon this point, and in the case of Western Union Telegraph Co. v. Dickson, supra [27 Tenn. App. 752, 173 S. W. (2d) 719], the late lamented Judge Anderson of this Court, said:

"We do not, of course, mean to say that one having the right-of-way is relieved of the duty to exercise ordinary care, but the fact that the right-of-way is his and he knows it, is a factor and may be an important one in determining what is required by ordinary care with respect to the use of the senses and otherwise; for such an one may proceed upon the assumption that vehicles approaching that point will be under control so as to enable the operators to perform their duty to yield the right-of-way. Compare Tri-State Transit Co. of Louisiana v. Duffey, 27 Tenn. App. 731, 173 S. W. (2d) 706."

It is true that when he made that statement he was discussing the right of a pedestrian, but the reasoning is fully applicable to the case now before us.

The witnesses did not have to tell us that automobiles approaching a hill in the opposite direction could not be seen by the driver of the other car until a sufficient portion of the crest had been reached to permit such to occur. It is a matter of common knowledge that these yellow lines along our highways are put there for the purpose of keeping motorists and others who are traveling the incline to stay in their own lane of traffic, and that the uppermost end of these forbidden crossing stripes is at the point where the view is available over the crest. There is no greater danger which the traveling

public faces than a violation of the law in steering a motor vehicle to the wrong side of such forbidden strip until it has reached a point where the view is clear over the crest to see oncoming traffic. The undisputed proof in this case is that this highway was a 2-lane highway, one to be used by vehicles traveling north and the other for vehicles traveling south.

To say that a person must drive his automobile along the highway at such speed so that if he is faced with an object moving the wrong way in his lane of traffic at the crest of the hill, must always travel at such speed as that he could control his automobile or motor vehicle when he had to move off to the shoulder of the road which was muddy and keep it from skidding and under control so as to prevent an accident resulting immediately therefrom, just within an instant, as all the parties have said, would require the exercise of a degree of care which would be wholly unreasonable.

Without going into too much detail with respect to the corroboration and support given to the plaintiff's evidence by that of defendant, we set out some of the questions and answers, and some of his general statements:

"A. Well as I was approaching the truck I was driving along normally at a moderate speed, and just in a split second you might say, this Plymouth, 49 or 50 Plymouth whatever it was, the maroon Plymouth, cut from behind the truck, and I couldn't see the car until it pulled out, to know what his intentions were I don't know, I do know that he was in my lane and we were right there together, no time to do anything but to try to think about saving my life and the life

of the people in the oncoming vehicle, and what I did, just like I say, in a split second, to try to avoid this head-on collision I immediately tried to get off the road and give him room to get in, thinking maybe that the truck would give him some room, whether he did or not I don't know, I didn't have time to see, but any way as I cut off why he was by just like that, that is how close it was and he side swiped the truck in passing, and as I went off my intentions were to keep my car off the road completely because I had glanced out at the field there and it seemed to be a fairly level area, I mean so that the car wouldn't just run out in the mud and bog down or something, so I figured if I could swing it off the road why that would be it, as I pulled off that is when I hit the mud and of course it spun back on the road then and it was beyond my control at the time.

"Q. Now do you know whether or not you pulled the car back on the highway? A. No, sir, I didn't.

"Q. Do you know how come it to come back on the highway? A. Yes, sir, there is proof right there, when the back end swung around of course the front end was headed across.

"Q. Did you apply your brakes or do you know whether you applied your brakes or not? A. No, sir, I remember applying the brakes prior to going off, but I tried to release the brake after I went off and I am almost sure that I did.

\* \* \* \* \* \*

"Q. And state at what point you actually lost control of the car? A. That is—well when I went

off the road, sir, like I say my intentions were staying off the road, so if I had had control, then I would have stayed off the road.

* * * * * *

"Q. In other words, did you know at the time that the rear end of your car was spinning to the right, that it was spinning to the right, did you know it at that time or are you just giving your opinion about that? A. Yes, sir. Can I say one thing maybe? (continuing answer) Yes, sir. As I was going to say, when I cut off the road, my wheels were turned to the right, and as I say my intentions were to go out in the field and it hit the mud, the back end spun or skidded, whatever it did, and it was out of my control then."

The statements of the witness Purnell also support and corroborate the statements of plaintiff. Briefly quoting this witness, he said:

"Well there were three vehicles coming in the other direction, they seemed to be in their lane too, the first one was a pick-up truck and had either a horse of a mule in the small cab in the back of it that makes you think you kind of overload the pickup, and behind that was another car, my recollection is as I recall it now, it was a maroon, and I would guess it was a Plymouth, of course I didn't pay real strict attention it it, that was my impression of it, and behind that was a third car, I believe that was a new Ford, if I recall correctly, and as we approached these three vehicles, the middle car, the red one, pulled out into our lane in an attempt apparently to pass the pickup truck, I don't know why he didn't get

back in his lane when he saw us coming, but he didn't, I guess he thought he had time to make it, he came right on headed toward us and you could see then that something was going to happen. Well the car in front of me put on his brakes and pulled over to the right on the shoulder and because it had been raining, the shoulder was soft and he started to skid, he went down the road sideways in our lane, * * * and just about that time the car in front of me going sideways crossed the center line and got over into the other lane, the last car in that lane was this new Ford and hadn't stopped and he hit him, as I recall it, just head-on, on the broad side rather, square in the middle of his car * * *''

And again he said:

"Q. You say the negro car was going sideways, was the front of his car,—say the road is running north and south there—was it headed to the west or was it headed to the east? A. To the east.

"Q. It was headed to the east? A. Yes, sir, that was the car that was ahead of me?

"Q. Yes. A. Yes, sir, it was headed to the east, his back end hooked in the mud and swung around, his front end was headed east.''

It seems apparent from the whole proof that the defendant followed a course of action which began suddenly because of a perilous emergency, and which was the most reasonable and the only one that could have appeared to a person exercising ordinary care and being willing to take a chance to avoid a head-on collision with the maroon Plymouth or the pickup truck. It is

apparent that he had to act upon the impulse of a moment and in an extremely perilous situation for which he was in no wise responsible, and which, from the beginning to the end was but a moment, as said by plaintiff it all happened as quickly as the snapping of his fingers.

It is our opinion that this case is governed by the principle laid down in the case of Coleman v. Byrnes, 34 Tenn. App. 680, 688, 689, 242 S. W. (2d) 85, 88, which is strongly relied upon by defendant to support his Assignments of Error being immediately considered.

It is true that in that case the Trial Judge directed a verdict for the defendant. The accident occurred on the pavement of a street in the city of Memphis. A garbage truck was headed south and near the west curb. Plaintiff was riding a bicycle in a southerly direction, and as he approached the rear of the garbage truck he suddenly swerved his bicycle from behind the garbage truck to his left and toward the center of the street, which caused him to pursue a southeasterly course at that moment, when the driver of defendant's truck traveling north, seeing the boy emerge from behind the garbage truck in an angling direction, swung sharply to the right and the rear end of the truck came around left or to the west side of the street, striking the young man on the bicycle, severely injuring him. Analyzing the facts in that case, the then Presiding Judge of this Court said:

"But when the defendant driver's vehicle was about even with the cab of the garbage truck, the boy on the bicycle suddenly appeared from the rear of the truck, headed, at an angle, it may be, toward the center of the street. Had he continued at that angle, he would have crossed the path of the truck; if he

had made a sharp turn to the right he would not have done so. Confronted with this situation, the driver could not know and had no time to determine what the boy would do. Nor did he have any time to make any measurements to calculate the distances. He was thus confronted with an emergency and in concluding to put down his brake and swerve his vehicle rather than to go straight ahead, the conclusion is inescapable that he was acting according to his best judgment.

"The rule applicable to this situation as adopted by our Supreme Court from Ruling Case Law, is stated as follows: 'One who in a sudden emergency acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence.' Moody v. Gulf Refining Co., 142 Tenn. 280, 218 S. W. 817, 820, 8 A. L. R. 1243.

"It has been well said that the 'Law does not require perfect faculties or perfect use of existent faculties, but only "ordinary care", which presupposes a margin of error and is erected upon the supposed doings of average man likely situated, making allowance for mistakes in judgment.' Kansas City M & O Ry. Co. of Texas v. Perry, Tex. Com. App., 6 S. W. (2d) 111, 112. No more is required than such care as an ordinarily prudent person would exercise under the same or similar circumstances. In negligence cases what an ordinarily prudent person would do in the particular circumstances is not the subject of proof, but a matter for which the triers of fact, whether the jury or the court, must draw upon their observation and experience with respect to what is

customarily regarded in the community as a prerequisite for the protection of others. 'Ordinary care' in the abstract means such care as is commonly exercised by the majority of the persons or ordinarily prudent habits in the community when placed in similar circumstances. Vol. 30, Words and Phrases [Ordinary Care], pp. 194, 195.

"When these principles are applied to the facts favorable to the plaintiffs in the present case, the inquiry is narrowed to the simple question of whether, according to observation and experience, the great mass of prudent persons in the community would have put on the brakes and pulled the truck to the right when the boy on the bicycle suddenly appeared from behind the garbage truck. As already indicated, common experience requires that this question be answered in the affirmative."

It seems reasonable to say that if automobiles did not skid on wet dirt surfaces, we would not need to spend so many billions of dollars in the construction of hard surface highways. It also appears to us that when this defendant suddenly swerved his car into the soft shoulder, the car did skid and in an instant of time that skidding, which resulted from the sudden swerving of the car onto the shoulder to avoid a head-on collision, brought it back on the pavement into the path of the car driven by plaintiff, and there is no reasonable proof to the contrary.

In that view of the case we cannot see how a jury question was presented. We think the Trial Judge erred in not directing a verdict for the defendant, or to say the least that could be said, as we view the record, the

minds of men in a reasonable deliberation upon the facts presented by this record, unswayed by sympathy, could have properly reached only the conclusion that defendant did nothing that an ordinarily prudent person, with reasonable intelligence, would not have done in the same circumstances and under the same conditions.

Applying the principle laid down then by our courts in many cases and repeated in the case of Coleman v. Byrnes, supra [34 Tenn. App. 680, 242 S. W. (2d) 91], as follows:

"But apart from the foregoing, the plaintiffs-in-error are confronted with the issue with respect to the proximate cause of the injuries complained of.

"The Supreme Court has said: 'What is meant by "proximate cause" is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather is the meaning.' Citing authorities. Grigsby & Co. v. Bratton, 128 Tenn. 597, 603, 163 S. W. 804, 806."

We are unable to agree with plaintiff's contention that a reasonable inference could be drawn from the facts that the defendant's negligence in not bringing his automobile under control and continuing on south along the west shoulder of the road constituted the proximate cause of the collision with the car driven by plaintiff which produced his injury.

All the physical facts and the evidence are to the effect that defendant's car was not on the shoulder of the highway in excess of 100 feet, and to find that it was as much as that distance, or to determine that defendant

was exceeding a reasonable speed at the time the maroon Plymouth was coming head-on toward him, cannot be concluded except from pure speculation from statements of plaintiff which are in themselves pure speculations, or more correctly defined as imagination, and could not be said to produce reasonable inferences under the Scintilla Rule, which is not recognized in this State. Of course it is lamentable that plaintiff's injury was caused without any negligence on his part, but one who operates an automobile on our highways is not an insurer against every possible injury or damages that may result from such operation.

The Assignments of Error numbered I, II and VI are sustained, the verdict and judgment of the Court thereon set aside, and plaintiff's case dismissed at his cost.

Let judgment be entered here in accord with this Opinion.

Bejach, J., concurs.

Carney, Judge (dissenting).

In my opinion there was sufficient evidence upon which the jury could have found the defendant Cawthon guilty of proximate negligence.

I do agree that the defendant Cawthon was faced with a sudden emergency when the driver of the maroon Plymouth pulled directly into his pathway and he was not negligent in driving his automobile off the pavement onto the right side of the road.

However, I think the jury could reasonably have found from the evidence that the defendant Cawthon was driving at an excessive rate of speed and therefore guilty of

proximate negligence at the time he was confronted with the sudden emergency and also that the jury could reasonably have found that the defendant Cawthon was guilty of proximate negligence in failing to retain or regain control of his automobile after safely pulling off the highway onto the right shoulder of the road. The evidence shows that the defendant drove a considerable distance southward on the right shoulder and then pulled his automobile completely across the southbound lane of traffic on the paved highway over into the northbound lane of traffic on the east side of the road directly in front of the plaintiff's automobile which was stopped or almost stopped.

Under all these circumstances I think reasonable men might well differ as to whether or not the defendant was guilty of proximate negligence and therefore I respectfully dissent from the majority opinion.