STANFORD v. HOLLOWAY.—157 S. W. (2d), 864.

Middle Section.   June 21, 1941.

Petition for Certiorari denied by Supreme Court, January 17, 1942.

Pride Tomlinson and David Trice, both of Columbia, for plaintiff in error Alia Stanford.

Paul F. Bumpus, of Columbia, for defendant in error Sam Holloway.

CROWNOVER, P. J.  This is an action for damages for personal injuries that occurred in an automobile collision and resulted in death. The action was instituted by Sam Holloway before his death; he died of the injuries for which his suit was brought, and left a widow and children, and the suit was proceeded with (without revivor) by the widow for the use and benefit of herself and children. Code, sec. 8238.

The defendant filed two pleas:  (1)  This suit should have been prosecuted under the Workmen's Compensation Act, Code, secs. 6851-6901, and not under Code, sec. 8238.  (2)  Not guilty.

The plaintiff filed a demurrer to the first plea of the defendant, averring that the Workmen's Compensation Law of Tennessee did not effect the rights of any of the persons interested in this action, which demurrer was sustained.

The case was tried by the judge and a jury on the plea of not guilty.

At the close of the evidence for the plaintiff the defendant moved the court to dismiss the suit on the ground that the plaintiff Sam Holloway was insane at the time the suit was instituted, therefore he could not authorize said suit, and the suit was instituted without his authority, which motion was overruled.

Thereupon the defendant moved the court for peremptory instructions in her favor on the grounds (1) that there was no evidence of negligence on her part, and (2) the plaintiff was guilty of contributory negligence, which motion was overruled.

At the conclusion of all the evidence the defendant renewed the foregoing motion, which motion was overruled.

The jury returned a verdict of $15,000 in favor of the plaintiff and against the defendant, and judgment was entered accordingly.

The defendant's motion for a new trial was overruled and she appealed in error to this court, and has assigned errors, which are, in substance, as follows:

(1)  There is no evidence to sustain the verdict, and the court erred in refusing to direct a verdict for the defendant at the conclusion of all the evidence.

(2) The deceased was guilty of contributory negligence.

(3) The court erred in refusing to charge the defendant's special request to the effect that it was the duty of Holloway to place flares upon the highway to the east and the west of the disabled Frierson automobile and the wrecker to warn travelers on the highway that they were approaching a dangerous situation, and that if the jury found that his failure so to do was the proximate cause of said collision there could be no recovery.

(4) The court erred in refusing to charge the defendant's special request to the effect that if the jury found that the wrecker was equipped with a spot light of such power that it blinded the defendant just as her automobile entered upon the sheet of ice on the highway, which caused her to lose control of her automobile and resulted in said collision, there could be no recovery on the part of the plaintiff.

(5) The court erred in excluding evidence of an admission of the decedent to the effect that the collision was not her fault.

(6) The court erred in sustaining the plaintiff's demurrer to the defendant's first plea, which plea was that this suit should have been prosecuted under the Workmen's Compensation Act.

(7) The following remarks, made by the plaintiff's attorney in his closing argument to the jury, were prejudicial to the rights of the defendant:

"I want Mr. Tomlinson to tell this court and jury who he really represents. I know who he really represents, and I call upon him to tell the court and jury who it is."  . . .

"If my sister should have an automobile accident and was sued for it as defendant now is, I hope that she will be as well represented, and as well protected and as well provided for as the defendant is represented, protected and provided for in this case."

(8) The court erred in overruling the defendant's motion for a new trial because of improper conduct of the jury, in that, one juror told another juror that the defendant had $30,000 to $40,000 of insurance, and that the insurance company had offered $15,000 as a compromise, and that another juror stated, let the insurance company pay the judgment.

(9) The verdict is so excessive as to indicate passion, prejudice and caprice on the part of the jury.

The essential facts, as disclosed by the record, are as follows:

The automobile collision out of which this suit arose, occurred on the state highway that leads from Columbia to Mt. Pleasant, in Maury County, known as the Jackson Highway, at a point about six miles west of Columbia and five miles east of Mt. Pleasant, on the night of January 3, 1940.

The highway leads generally east and west, the paved or concrete portion is 18 feet wide, and the gravel shoulders are 8 feet wide. The crest of a slight hill is near the St. John's Episcopal Church, which is on the south side of the road. At about the crest the road curves

slightly to the left, about a 2 degree curve, and there is a gradual incline. toward the west, a 2% grade.

The point of the collision was about 229 feet west of the crest of the hill.

It was January, 1940, and the weather was very cold. There had been a snow several days before, and on this date there was a sheet or spot of ice on the north side of the highway.

In the late afternoon of that date, at about 4:30 P. M. Mrs. Frierson was driving her automobile along this highway, going from Columbia to Mt. Pleasant. Another automobile was just in front of her, traveling in the same direction. When she reached about the crest of the hill the automobile in front of her skidded on the ice and slipped about on the highway. In an effort to avoid it she applied her brakes, and her automobile skidded across the highway into the rock wall around St. John's Episcopal Church.

Several negro boys were walking along the highway and saw Mrs. Frierson's automobile skid into the rock wall. She asked them to watch her car while she went to call a wrecker.

The boys pushed the automobile across the road to the north shoulder and a little further west, about 100 feet, and headed it west toward Mt. Pleasant, put on the brake, put it in reverse gear, and turned on the rear lights and the head lights dimmed. It was on the shoulder with its left wheels about 18 inches to 2 feet from the concrete pavement.

As the weather was very cold, the boys made a fire between the shoulder of the road and the fence line, on a line with the middle of the automobile.

The wrecker of the Universal Auto Company, of Columbia, driven by the plaintiff, Sam Holloway, arrived after dark. Holloway drove the wrecker onto the shoulder and backed it up to the front of the Frierson automobile, headed west. The wrecker was about two feet in front of the Frierson car, on the shoulder, 18 inches to 2 feet from the pavement, with its head lights burning and its three colored signal lights on the crane at the top burning, and a spot light or flood light burning which was fastened to the bar at the top and focused so its light would fall on the point where the wrecker was to be attached to the car to be moved. Holloway and another employee of the Universal Auto Company who had accompanied him, went on the ground between the wrecker and the automobile to fasten the chains of the wrecker to the automobile. Before they had fastened the chains the Frierson automobile was struck by the skidding automobile driven by the defendant, Miss Alia Stanford, and the Frierson car was driven against the wrecker, fastening the two men between the two cars. Holloway suffered severe injuries from which he died.

The defendant Miss Stanford's automobile had skidded on the ice at the crest of the hill, when she lost control and it turned around,

and her car's left front fender struck the left side of Mrs. Frierson's car.

While the colored boys were waiting for the wrecker they saw several cars skid on the ice, but their drivers regained control and no accident happened. Several cars skidded there after this accident, but there were no other accidents. Several cars passed without skidding, including the Greyhound bus and the wrecker.

█ 1, 2, 3 and 4. After a careful reading of the record, we are of the opinion that there was evidence to support the verdict of the jury that the defendant was guilty of negligence and the plaintiff Sam Holloway was not guilty of contributory negligence. The evidence is uncontroverted that the Frierson automobile, the wrecker, and Sam Holloway were on the shoulder of the road and about 18 inches to 2 feet from the pavement, when the defendant's automobile skidded onto the shoulder and struck the Frierson automobile, which knocked it against the wrecker and pinned Holloway between that car and the wrecker.

The defendant insists that the collision was caused by ice on the road, and was unavoidable.

There is much dispute about where the ice began on the highway and where it ended, but there is evidence that there was some ice on the north side of the road at the crest, and some evidence that there was no ice within 95 to 100 feet of the wreck, and she could have avoided the accident had she had her automobile under control.

█ She says she was familiar with the road, and was running from 20 to 30 miles an hour. But there is evidence that she was running at a rapid rate of speed. She overtook and passed a Greyhound bus. It is not shown how fast the bus was traveling on this occasion, but its usual rate of speed was 60 miles an hour. When the collision occurred, her automobile was driven with such force against the Frierson car and against the wrecker as to knock them the length of the car. It was a cold night, snow on the ground, the snow had melted in the road that day, but had frozen again that night, causing slippery places. Taking all the facts and circumstances together we think the question of negligence was one for the jury.

The defendant's own testimony shows that after her car began to skid she made no effort to put it under control and to ride out of the skid. She testified as follows:

"It started pulling to the right and swerving and I was trying to pull it to the left to avoid the ice as much as possible but I lost control and wasn't able to pull it any way. . . ."

"Q. Was there anything you could do after you struck that ice that you didn't do to prevent hitting the Frierson car? A. Not a thing in the world. I tried to get out of the way. I couldn't miss it."

"Q. Did you put on your brake? A. If I did I wasn't conscious of it. . . ."

On cross-examination she was asked the following question:

"Q. Are you able to state to this jury any effort you made to put your automobile under control after you hit that spot of ice on the road except to try to straighten it out with the steering wheel? A. There wasn't much else you could do.

"Q. Anything else you undertook to do except to straighten it out with the steering wheel? A. I wasn't conscious of it."

The jury may look to the surrounding circumstances in determining whether the defendant is guilty of negligence either in the inception or the continuation of the skidding.

"The circumstances surrounding the skidding, however, may be such as to warrant an inference of negligence, as a matter of fact, either in the inception or continuation of the skidding. It is therefore for the jury to determine whether the skidding was not reasonably to be anticipated or more effectively guarded against. Considerations as to the use of third rather than a lower gear, the rate of speed indicated by the circumstances and results, the failure to apply brakes until the collision was imminent, or applying the brakes all of a sudden too effectively, the driver's conduct in directing and confining his efforts to an attempt to get the front wheels in line with the rear by turning the former to the left, the slippery condition of the street known to the driver, the tendency of the vehicle to skid upon sudden application of the brakes, or any other element of the situation may, in the minds of the jury, constitute negligence in not preventing or restricting the skidding of the automobile." Vartanian on The Law of Automobiles in Tennessee, 204, sec. 73; De Antonio v. New Haven Dairy Co., 105 Conn., 663, 136 A., 567, 569; Schoepp v. Gerety, 263 Pa. 538, 107 A., 317, 318; Philpot v. Fifth Ave. Coach Co., 142 App. Div., 811, 128 N. Y. S., 35.

"The contributory negligence of the party injured by the skidding car is also ordinarily a question for the determination of the jury. When it is not clear that the plaintiff did that which a man of ordinary prudence under like circumstances ought not to have done, the question will be submitted to the jury and a verdict in his favor will not be set aside." Vartanian on The Law of Automobiles in Tennessee, 206-207, sec. 73; Bernstein v. Smith, 86 Pa. Super., 366.

Negligence of automobile driver as respected skidding of car on icy street with resulting collision held for the jury. Tente v. Jaglowicz, 241 Ky., 720, 44 S. W. (2d), 845; Butner v. Whitlow, 201 N. C., 749, 161 S. E., 389.

"Skidding is not, as sometimes claimed, a mysterious happening, a ·sort of 'act of God' beyond the control of the operator. It is a perfectly definite result of certain physical forces, such as the speed of the car, its weight and distribution of weight, and the friction between the rear wheels and the road. Some cars skid more easily than others. The tendency to skid may depend on the number of passengers and whether they are sitting in the front or rear seats. Wet, icy, or greasy roads and especially wet car tracks are potent and well known dangers

which may be diminished by the use of nonskid tires and tire chains and by reduction of speed. It is well known that a sudden application of the brakes on a slippery pavement will almost inevitably cause the car to skid and swerve from its course. . . .

"The courts have generally recognized these conditions and hold that the mere fact that the car skidded is no defense to the motorist, that his negligence is a question for the jury." Babbitt on Motor Vehicles, 231, sec. 345; Grizzard & Cuzzort v. O'Neill, 15 Tenn. App., 395, 399.

"A driver must keep his car under control when driving on wet and slippery streets, and if he operates it so that it is out of his control he is guilty of negligence. National Cash Register Co. v. Leach, 3 Tenn. App., 411.

"The question of Cuzzort's negligence was properly submitted to the jury under a correct charge of the court." Grizzard & Cuzzort v. O'Neill, supra.

It is insisted that the defendant acted in an emergency, and should not be held guilty of negligence if she did not take the best and wisest course. If the emergency was brought about through her negligence, this rule does not apply. Cullom v. Glasgow, 3 Tenn. App., 443.

Whether an emergency existed, and whether the defendant brought it about through her own negligence, and whether she acted as an ordinarily prudent person under the circumstances, were questions for the jury.

"Whether plaintiff had time to stop his motorcycle, dismount and step up on the sidewalk, and, if he did have time to reach a place of safety in that way, whether an ordinarily prudent person, situated as plaintiff was, would have adopted that means of escape from the impending collision, and whether an ordinarily prudent person, when confronted with sudden peril, or emergency, such as that which confronted plaintiff, would have pursued the course which plaintiff followed, were all questions for the jury to determine from the evidence." Power Packing Company v. Borum, 8 Tenn. App., 162, 169.

The defendant contends that Holloway's failure to put out flares while the wrecker was on the shoulder being attached to the Frierson automobile was contributory negligence.

There is nothing in this contention. Lights of different colors were burning on the Frierson automobile and the wrecker, and both were out on the shoulder of the road. And the proximate cause of the collision was the defendant's failure to keep her car under control or put it under control after it skidded.

Code, sec. 2695, subd. C(b), as amended, provides that every bus, truck, or truck tractor operating outside the corporate limits of municipalities, shall carry at least three flares or red electric lanterns.

The wrecker was carrying flares. There was no use to put them

out when the head lights and tail lights of the Frierson car and the wrecker were burning, they being out on the shoulder.

The act requiring busses and trucks to carry flares was evidently passed to cause them to have lights they could put out if their own lights failed and they were broken down on the paved portion of the highway.

There was no duty upon Holloway to put out flares to warn the public of ice on the road. Even if it had been his duty, it was not shown that he knew that the road was slippery. His wrecker did not skid on it.

The defendant testified that she was temporarily blinded by the spotlight or flood light on the wrecker. Witnesses for the plaintiff testified that this light was permanently fastened to the bar on the crane and focused on the ground at the rear of the wrecker. There was evidence that the lights on the wrecker would not blind a driver on the road.

However, the proximate cause of the collision was the fact that the defendant negligently failed to put her car under control after it skidded on the ice.

It results that we hold that there was evidence to support the finding of the jury that the defendant was guilty of negligence and the plaintiff was not guilty of contributory negligence, and the court was not in error in refusing to direct a verdict for the defendant and in refusing to charge the defendant's special requests as to flares and the spotlight.

It is not shown that these special requests for instructions were made after the general charge and before the jury retired, but the record does show that they were presented to the trial judge before he charged the jury. Tennessee Procedure by Higgins & Crownover, secs. 1459, 1460; Louisville & N. Railroad Co. v. Tays, opinion of this court filed at Nashville on April 1, 1933.

5. The court correctly excluded the statement made by Holloway on the way to the hospital that the accident was not the defendant's fault. This was not a part of the res gestae. It was only hearsay evidence. And Holloway didn't know the facts as to the cause of the accident as he was down fastening the Frierson car to the wrecker. He didn't know that the defendant had made no effort to overcome the skid. The statement was evidently made to console the defendant who was weeping at the time, and should not be taken as an admission against interest.

6. The court correctly sustained the plaintiff's demurrer to the defendant's plea No. 1, and this assignment must be overruled.

Code, sec. 6865, provides that whenever an injury shall have been sustained under circumstances creating in some other person than the employer a legal liability to pay damages in respect thereto, the injured employee may, at his option, either claim compensation (under the Workmen's Compensation Law) or proceed at law against such

other person to recover damages, or proceed against both the employer and such other person, but he shall not be entitled to collect from both.

A settlement under one action bars the other. McCreary v. Nashville, etc., Railroad, 161 Tenn., 691, 695, 34 S. W. (2d), 210.

Holloway elected to sue the defendant and instituted suit in his lifetime. On his death the suit was proceeded with, without revivor, in accordance with Code, sec. 8238, as it was shown that he died of the injury for which this suit was brought, and he left surviving him a widow and children. Tennessee Procedure by Higgins & Crownover, secs. 943, 333. The declaration avers that Holloway is dead and that this suit is presented by the widow for herself and children.

7. We are of the opinion that the assignments which complain of the statements made by the plaintiff's counsel in his argument to the jury, are not well made and must be overruled.

(a) It appears that in the argument to the jury the defendant's counsel stated that this suit was instigated by the Universal Auto Company in order to avoid paying compensation to the widow and dependents of Holloway under the Workmen's Compensation Act. Counsel for the plaintiff, in his closing argument to the jury, in answer to this statement, told the jury that he represented Sam Holloway's widow and children, and then stated that he had told them whom he represented, but that counsel for the defendant had not told them whom he represented, whereupon Tomlinson replied that he represented the defendant Miss Stanford, and thus ended the colloquy.

(b) The widow and children lived some distance from Columbia and were not able to be present the first day of the trial. Counsel for the defendant commented on the fact that they were not at the trial. The widow and five little girls were present on the second day, and on several occasions during the argument when reference was made to the suffering and injuries of Holloway, the little girls cried. One of the grounds assigned for a new trial was that the jury was influenced by the tears of the children. An affidavit of an attorney at the bar of Columbia and an affidavit of the plaintiff's attorney were introduced which showed that the children wept quietly and no unseemly demonstration was made.

(c) The defendant contends that counsel for the plaintiff told the jury that if his sister should have such an accident and be sued he hoped that she would be as well represented and as well protected and as well provided for as the defendant Miss Stanford. From these statements it is argued that he had reference to liability insurance.

(d) The defendant further contends that counsel for the plaintiff told the jury that if it should make a mistake in reaching a verdict against the defendant, this mistake could and would be

corrected by the trial judge, and if the trial judge did not correct, upon a motion for a new trial, such mistake, then the Court of Appeals would upon appeal of the case correct such mistake.

Paul F. Bumpus, attorney for the plaintiff, filed an affidavit stating that the foregoing remarks, set out in ''c'' and ''d'' were made in language different from that stated, and had no reference to insurance.

Hence we think there is nothing in these contentions.

8. The defendant contends that she should have a new trial because of improper conduct of the jury. She introduced an affidavit of a juror, W. K. Johnson, that some member of the jury had told the other jurors that she had between $30,000 and $40,000 of insurance and had offered to pay $15,000 in settlement of the case. Ten of the jurors testified that they heard no such statements, while one other juror said he heard some reference to insurance and then some juror replied that they could not consider that fact, and all of them said it had no influence on their verdict; hence, this assignment is overruled.

9. We are of the opinion that the verdict is not excessive, and the defendant's ninth assignment of error must be overruled.

Holloway was 41 years of age, in good health, and was a good mechanic. He was pinned between the Frierson automobile and the wrecker, and severely crushed in the hips, back and legs.

It was shown by his physician that when he first saw Holloway following his injuries, he had general body bruises and lacerations about his face and scalp and the top of his head; general body bruises over the remainder of his body, and in the region of the hips; between the hips there was a large bruised area; he was complaining of severe pain, and was unable to empty his bladder. Blood was coming from the urethra or tube leading from the bladder to the outside of his body.

His urethra was torn as a result of a fracture of the bone of the pelvis, which bone had been broken and forced through the soft parts of the muscles and through the urethra, as a result of which he could not empty his bladder.

This condition necessitated the surgical operation of making an artificial opening in the bladder on the lower part of the abdomen to drain the bladder that way; and in addition to that an incision had to be made between his legs to locate this torn place in the urethra, and that had to be repaired, necessitating two operations.

The broken edges of the pelvic bone were rather rough and split, irregular, not just a straight break, and some of these sharp ends tore the surrounding flesh, and included in that flesh were blood vessels, muscles and the urethra. When these arteries and blood vessels were broken, it resulted in hemorrhage, blood getting outside of the blood vessels into the surrounding tissues.

He also suffered what the physician designated as ''extravasation,'' which he explained as follows:

''When the urine doesn't pass through its natural channel and

gets out into the soft parts, it is spoken of then as extravasation, meaning the urine gravitates throughout these soft tissues and that is a very serious condition because of the injurious effect on these tissues by the urine, which is infected, and that lets infection get out into the surrounding tissues.''

The witness testified that Holloway suffered from such infection, and also from septicemia or blood poisoning, bacteria growing in the blood stream, originating in the area where he was injured.

He also suffered from ulceration of the wall of the rectum, and the doctor described his condition in this respect as follows:

''The wall of the rectum breaks down as a result of injury and infection, resulting in perforation quite often, allowing the contents of the rectum, the fecal matter, to escape through unnatural channels.''

Holloway was in the hospital in Columbia from January 3 to January 13, and then, because of the seriousness of his condition, he was sent to a specialist in Nashville, and was taken by ambulance to St. Thomas Hospital and placed under the care of Dr. Burnett Wright. Dr. Hart, however, kept in communication with him, and Dr. Wright had Dr. Billington, a bone specialist, to see him, and also had Dr. Bryan to see him. While in St. Thomas Hospital he developed fecal fistula, the bowel movement came through this opening between his legs.

On the 15th of February he was sent back to the hospital in Columbia, and then grew worse and died on February 23rd, in the King's Daughters' Hospital in Columbia.

The only possible way for his urine to escape was through a tube that had been placed in his body for that purpose.

Due to the seriousness of his condition it was necessary that he be attended by special nurses, both day and night. He was given five or six blood transfusions.

The three Nashville physicians were well known in their professions and regarded as capable men, and everything known to medical science was done to save his life.

So intense was his suffering that he developed acute mania or acute mental breakdown, as a direct result of his injuries.

His injuries were of such nature as to cause intense suffering and agony, both physical and mental, and he did undergo mental and physical agony during the 51 days he lingered after he was injured until his death.

His death was due directly to the injuries he sustained in this accident.

The doctors', nurses', and hospital bills amounted to more than $1,500.

All of the assignments of errors being overruled the judgment of the lower court is affirmed. A judgment will be entered in this court in favor of the widow and children and against Miss Stanford for $15,000, with interest thereon from August 2, 1940, to the present,

together with the costs of the cause that accrued in the lower court. The costs of the appeal are adjudged against Miss Stanford and the surety on her appeal bond.

Felts and Howell, JJ., concur.