Ronnie SMITH et al., Plaintiffs-Appellees,

v.

Thomas H. BULLINGTON, Jr., et al.,
Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section.

April 27, 1973.

Certiorari Denied by Supreme Court
Oct. 1, 1973.

---

Don Wyatt, Fayetteville, for plaintiffs Thomas O. Knight and wife.

Boston & Weatherford, Lawrenceburg, for plaintiffs Smith.

Lloyd & Bussart, Lewisburg, for defendants Bullington.

Stevens & Bagley, Fayetteville, D. C. Lee, Pulaski, for defendant Rambo Motor Co., Inc.

## OPINION

TODD, Judge.

These five consolidated suits arise out of a motor vehicle collision on U. S. Highway 64 on December 25, 1971. One of the vehicles was operated by Ronnie Smith and was occupied by passengers, Sandra Smith, Mattie B. Smith and Albert Carroll Smith, the owner of the vehicle. The other vehicle was owned by Rambo Motor Company, Inc., leased to Thomas H. Bullington, Sr., operated by Thomas H. Bullington, Jr., and occupied by three passengers, Tula Bullington, Betty Bullington, and Tommy Dwayne Knight.

All of the occupants of the Smith vehicle were injured. In the Bullington vehicle, Thomas H. Bullington, Jr., was slightly injured, Tula and Betty Bullington were seriously injured, and Tommy Dwayne Knight lost his life.

Suits were filed against Thomas H. Bullington, Jr., Thomas H. Bullington, Sr., and Rambo Motor Company, Inc., by Ronnie Smith, Sandra Smith and Mattie B. Smith for personal injuries and by Albert Carroll Smith for his personal injuries, for medical expense and loss of services incident to the injuries of Mattie B. Smith, and for damage to his vehicle. The same defendants were sued by Thomas O. Knight and Norma Wilkins Knight for the death of Tommy Dwayne Knight.

No party demanded a jury. The Circuit Judge, sitting without a jury, found the issues against all defendants in all cases and awarded compensation as follows:

Ronnie Smith $500

Sandra Smith $500

Mattie B. Smith $25,000

Albert Carroll Smith $8,379.85

Thomas and Norma Knight $75,000 reduced by "remittitur" to $50,000.

The defendants, Bullington Jr. and Sr., and the defendant Rambo Motor Company,

Inc., have filed separate appeals and separate assignments of error. The plaintiffs, Thomas and Norma Knight have appealed from the reduction of their judgment from $75,000 to $50,000.

The assignments of error of the Bullingtons are as follows:

"1. The evidence preponderates against the verdict and judgment in this cause.

"2. There is no proof of negligence on the part of defendant Thomas H. Bullington, Jr., upon which a recovery may be predicated.

"3. There is no negligence to substantiate the verdict even viewing the record in the light most favorable to plaintiffs.

"4. The Court erred in failing to direct and grant a verdict of dismissal at the conclusion of all of plaintiffs proof.

"5. The Court erred in allowing counsel for Rambo Motor Company to read into proof and record from American Jurisprudence Proof of Facts as evidence as a standard for determining when tires should be replaced for tread wear.

"6. The judgment in this cause is excessive in both cases, and proof in the Knight suit shows no pain and suffering and no pecuniary damages or expectancy of beneficiaries.

"7. The Court erred in declaring the witness, Thomas Maloy, not to be an expert and refusing him opinion testimony as such.

"8. All negligence was on the part of the defendant, Rambo Motor Company.

"9. The Court erred in allowing introduction of a recording made by Thomas H. Bullington, Jr.

"10. The deceased, Tommy Dwayne Knight, had the same opportunity to observe the condition of the road as the defendant, Thomas H. Bullington, Jr. and he did not warn the said Thomas H. Bullington, Jr.

"11. The deceased, Tommy Dwayne Knight, assumed the risk of which he had equal knowledge with the defendant, Thomas H. Bullington, Jr."

There is no substantial controversy as to the evidentiary facts. The issues relate to the inferences as to ultimate facts which may or ought to be drawn from the undisputed evidentiary facts.

A few days prior to the subject collision, the defendant, Thomas H. Bullington, Sr., (hereafter referred to as Dr. Bullington), contracted with the defendant, Rambo Motor Company (hereafter referred to as Rambo), to furnish a rental automobile for the use of his family during the Christmas holidays. Prior to December 25, 1971, said vehicle was driven by various members of the family without incident. The vehicle was never seen by Dr. Bullington before its delivery to his home, and he never operated it.

On Christmas Day, the Bullington family undertook a trip from Fayetteville to Ardmore in two vehicles. The first to depart was the rented Rambo vehicle. It was operated by the defendant, Thomas H. Bullington, Jr., (hereafter called Tommy Bullington). He was accompanied by his sisters, Tula and Betty, and Betty's fiance and houseguest, Tommy Dwayne Knight. Other members of the Bullington family were to follow in another vehicle.

The initial route of the trip was westward on U. S. Highway 64 from Fayetteville through Lincoln County to the Giles County Line, thence through Giles County to Pulaski. On the day in question, there was snow on the ground. In Lincoln County most of the snow had been melted or removed from the highway by scraping, salting and traffic. In Giles County, there was "slush" on the road, but the traveled lane on each side of the road was "clear" with a residue of snow in the center.

The scene of the collision was a short distance west of Lincoln-Giles County Line, in Giles County, where the highway is downhill going west and curves around the northwest side of a hill where the road is shaded from the sun by the hill. The Bullington vehicle was required to turn from a westward direction to a southwestward direction (to its left) in order to negotiate the curve. At the same time, the Smith vehicle was approaching from the west (meeting the Bullington vehicle) and was required to turn to its right in order to traverse the curve.

In the shaded area in said curve the Bullington vehicle encountered an unexpected area of ice. At this point, Tommy Bullington lost control of the vehicle which reversed ends and skidded a distance of 100 to 140 feet, crossing to its left side of the road where it collided with the front of the oncoming Smith vehicle. Thereafter the Bullington vehicle left the pavement and traveled another 30 or 40 feet off the road.

The Bullington vehicle had not slid previously on the highway and, according to its driver, entered the curve moving downhill at 35 to 45 miles per hour. The Smith vehicle entered the curve at 40 to 45 miles per hour, moving uphill, reduced its speed, but was unable to stop before the collision.

There is evidence that the scene of the collision was the only section of the road affected by icing at the time.

In respect to the negligence of Tommy Bullington, the declarations specifically charge:

1. Excessive speed.

2. Inadequate look-out.

3. Crossing center of highway.

4. Failure to avoid collision.

5. Driving on defective tires.

There is some evidence to support charges 1, 2 and 5, supra; however, there is no evidence that Tommy Bullington willingly crossed the center of the highway or negligently failed to avoid the collision after his vehicle began to skid.

It is inferable that the Bullington vehicle was being operated faster than was safe under the prevailing conditions and/or that a more meticulous look-out would have produced earlier vision of the icy area thereby giving earlier warning of the danger. There is evidence that the tread of the tires on the Bullington vehicle was rather thin (although not smooth). Without previous experience of spinning or skidding, it is doubtful that the operator of the vehicle was chargeable with the duty of measuring the depth of the tread indentations on tires before undertaking a short trip in a rented vehicle.

Accordingly, the real fact issues for this Court relate to the negligence of Tommy Bullington in regard to speed and look-out.

There is testimony suggesting that the speed of the Bullington vehicle was greater than that admitted by Tommy Bullington, supra (35 to 45 miles per hour), however, none of said testimony is sufficiently positive or substantial to controvert the testimony of Tommy Bullington on his speed.

As stated in the opinion of the Trial Judge:

". . . plaintiff must make out his case by a preponderance of proof. . . . Sometimes the preponderance is hard to find."

In this regard, the Trial Judge concluded:

"After hearing all the proof, the argument of all the Attorneys of record, viewing all the pictures, reading the briefs submitted, independent research, it is the conclusion of the Court that from the Lincoln County line to the place of the fatal collision the driver of the rented Bullington car had ample opportunity to reduce his speed, if he was driving too fast, otherwise slow his vehicle to

the point where he could control the same, and that his failure to do so coupled with defective rear tires was and is the direct and proximate cause of the collision."

The appellants, Bullington, argue correctly that a motorist is not an insurer against every injury resulting from his operation of a vehicle, citing Cawthon v. Mayo, 45 Tenn.App. 610, 325 S.W.2d 629 (1958). In the cited case, two of the three members of the Western Section of this Court reversed a jury judgment against a motorist who was forced off the road, lost control of his vehicle, moved across to the left side of the highway, and collided with the plaintiff. The dissent by the present presiding judge of the entire Court of Appeals pointed out that there was evidence from which a jury might reasonably conclude that defendant was negligent in attempting to reenter the road from the muddy shoulder before he regained control of his vehicle.

■ The present case is distinguishable from Cawthon v. Mayo in that Cawthon was faced with an unanticipated emergency as he met a vehicle coming over the crest of a hill in his own (Cawthon's) lane. Such an unlawful movement of another vehicle could not reasonably have been anticipated. In the present case, Tommy Bullington was well aware of weather and road conditions and he had entered an area (Giles County) where there was more snow and slush on the road than in the previous area (Lincoln County). It is reasonable to charge a motorist with knowledge of the well-known fact that there are areas of highway shaded from the sun where an unexpected residue of ice may be encountered, although the snow and ice may have melted elsewhere. Thus, in Cawthon v. Mayo, Mr. Cawthon had no reason to expect his emergency, whereas there are grounds to hold that Tommy Bullington should have expected his emergency.

■ Appellants also insist that skidding on a slippery pavement does not constitute evidence of negligence, citing Hatch v. Brinkley, 169 Tenn. 17, 80 S.W.2d 838 (1935). In that case, a passenger sued the driver of a vehicle which was wrecked when the right rear wheel inexplicably left the pavement as a result of which the vehicle went out of control. The plaintiff admitted that defendant had paid her hospital bills, that she knew defendant to be an inattentive driver, that she had a better view of the right edge of the pavement than the driver, and that she gave him no warning. After commenting upon abuse of hospitality and reluctance to impose liability upon a host, the Supreme Court held that the only negligence shown was traveling too near the edge of the pavement and that the plaintiff was guilty of negligence in this respect equal to or greater than that of defendant. On this basis, the suit of the guest was dismissed. In the present case, the speed of the Bullington vehicle was the primary responsibility of Tommy Bullington. His guest, Tommy Dwayne Knight, sustained some duty to warn of excessive speed; but his duty to control speed was measured by an entirely different standard from that of the driver. A passenger is not held to the same constancy of lookout or control as the driver, but is required to notice and act only upon such obvious or startling conditions or events as should challenge his attention in his passive role as a passenger.

■ Appellants cite Cawthon v. Mayo, supra, for the proposition that a motorist is not liable if he uses ordinary intelligence and skill, but ordinary intelligence and skill require a motorist to take note of snow and slush on a highway and to anticipate that there may be ice in a shaded area. This is especially true where the road is downhill and the vehicle would therefore be more difficult to stop or control.

Appellants also cite Hatch v. Brinkley, supra for proposition that a motorist is not liable if he exercises such skill as he pos-

sesses. As pointed out supra, the plaintiff, Mrs. Brinkley, knew that Mr. Hatch was an inept driver, hence the holding of the Court in Hatch v. Brinkley. There is nothing in the present record to relieve Tommy Bullington from the duty to exercise the care and skill of an ordinarily prudent motorist.

Appellants insist that loss of control on a slippery road is not negligence *if the motorist had operated the vehicle with due care immediately* prior to loss of control. In the present case, the evidence shows that Tommy Bullington was *not* operating with due care immediately before the loss of control for the reasons already stated. In Davis v. Sparkman, 55 Tenn.App. 65, 396 S.W.2d 91 (1964), cited by appellants, this Court reversed a directed verdict for plaintiffs and held that cause of loss of control was a jury question. In Shepherd v. Ball, 47 Tenn.App. 189, 337 S.W.2d 243 (1959), this Court approved a directed verdict for defendant who skidded on a slick spot *which he had not reason to anticipate.* Neither of said opinions is controlling in the present case.

■ Appellants, Bullington, next insist that they should not be held liable because their co-defendant, Rambo, was negligent in failing to remedy or disclose defects in the vehicle (slick tires) to the Bullingtons. The liability of Rambo will be discussed hereafter; however, the negligence, if any, of Rambo would not relieve the Bullingtons if Tommy Bullington was guilty of negligence in approaching the scene at an unsafe speed under the circumstances, as found by the Trial Judge.

■ Appellants, Bullington, next insist that there should be no recovery for the death of Tommy Dwayne Knight because said deceased did not exercise ordinary care for his own safety in regard to warning or admonishing the operator of the vehicle. Appellants rely upon L & N RR Co. v. Anderson, 159 Tenn. 55, 15 S.W.2d 753 (1929), wherein the passenger, Anderson, was aware of the railroad crossing, was aware that the driver had not stopped at the crossing, failed to look and see the approaching train and failed to admonish the driver, when an outcry even after the vehicle was on the tracks would have produced the slight acceleration needed to escape the train. The Supreme Court observed that the failure to stop could not have been anticipated and prevented by the passenger, but such gross negligence should have alerted him to look for and warn of the approaching train. In the present case, no such previous conduct or events occurred to alert the passenger.

In Tally v. Curtis, 23 Tenn.App. 181, 129 S.W.2d 1099 (1939) cited by appellants, a tenant was held contributorily negligent by living in premises after becoming aware of an unsafe condition. In Interstate Life & Accdt. Ins. Co. v. Cox, 55 Tenn.App. 40, 396 S.W.2d 80 (1965), cited by appellants, this Court affirmed a judgment for injuries from a defect in a parking lot even though defendant insisted that plaintiff had equal opportunity to see and avoid the defect. In Rogers v. Garrett, 217 Tenn. 282, 397 S.W.2d 372 (1965) cited by appellants, the Supreme Court affirmed recovery for injury of a "volunteer" who assisted in moving a tree knowing that bent tree limbs would spring up when released. In Pearce v. Canady, 52 Tenn.App. 343, 373 S.W.2d 617 (1963) the plaintiff, a practical nurse, was held to have assumed the risk of injury to her defective leg by the collapse and fall of a patient being assisted by the nurse. None of these authorities is controlling in the present case.

In Grizzard v. O'Neill, 15 Tenn.App. 395, this Court affirmed a judgment against a motorist who claimed unavoidable accident on a slick road, and said:

" 'Skidding is not, as sometimes claimed, a mysterious happening, a sort of "act of God" beyond the control of the operator. It is a perfectly definite result of certain physical forces, such as the speed of the car, its weight and distribution of weight, and the friction be-

tween the rear wheels and the road. Some cars skid more easily than others. The tendency to skid may depend on the number of passengers and whether they are sitting in the front or rear seats. Wet, icy, or greasy roads and especially wet car tracks are potent and well known dangers which may be diminished by the use of non-skid tires and tire chains and by reduction of speed. It is known that a sudden application of the brakes on a slippery pavement will almost inevitably cause the car to skid and swerve from its course. . . .

'The courts have generally recognized these conditions and hold that the mere fact that the car skidded is no defense to the motorist, that his negligence is a question for the jury.' Babbitt on Motor Vehicles, 231, Sec. 345.

"A driver must keep his car under control when driving on wet and slippery streets, and if he operates it so that it is out of his control he is guilty of negligence. National Cash Register Co. v. Leach, 3 Tenn.App., 411." 15 Tenn. App., pp. 399, 400.

In Stanford v. Holloway, 25 Tenn.App. 379, 157 S.W.2d 864 (1941) this Court affirmed a judgment for damages resulting from skidding and said:

"[3] The jury may look to the surrounding circumstances in determining whether the defendant is guilty of negligence either in the inception or the continuation of the skidding.

'The circumstances surrounding the skidding, however, may be such as to warrant an inference of negligence, as a matter of fact, either in the inception or continuation of the skidding. It is therefore for the jury to determine whether the skidding was not reasonably to be anticipated or more effectively guarded against. Considerations as to the use of third rather than a lower gear, the rate of speed indicated by the circumstances and results, the failure to apply brakes until the collision was imminent, or applying the brakes all of a sudden too effectively, the driver's conduct in directing and confining his efforts to an attempt to get the front wheels in line with the rear by turning the former to the left, the slippery condition of the street known to the driver, the tendency of the vehicle to skid upon sudden application of the brakes, or any other element of the situation may, in the minds of the jury, constitute negligence in not preventing or restricting the skidding of the automobile.' Vartanian on The Law of Automobiles in Tennessee, 204, sec. 73 (Citing authorities)" 25 Tenn.App., p. 386, 157 S.W.2d p. 869.

■ From all of the above, this Court concludes that the liability of the defendants, Bullington, was a question of fact for the Trial Judge, that there is evidence to support his finding against said defendants, and that the evidence does not "preponderate otherwise." T.C.A. § 27–303.

The foregoing discussion disposes of all of the assignments of error of the Bullingtons except those numbered 5, 6, 7, and 9, Supra.

■ Assignment 5 complains of the use of a Legal Treatise as evidence of facts. There is no citation of authority or portions of the record to support this assignment; hence, it may be treated as waived. Rule 13, Rules of Court of Appeals. Even if there was error in the consideration of such evidence by the Trial Judge, such error would be harmless because the proffered evidence was in defense of another defendant and not adverse to the interests of the appellants Bullington. Moreover, a judgment was rendered against the proponent, Rambo, in spite of the consideration of the disputed evidence. Furthermore, this non-jury cause is before this Court for consideration de novo, T.C.A. § 27–303, and any error in admission of evidence by the Trial Court can be readily corrected by this Court by disregarding the inadmissible evidence.

Berke v. Chattanooga Bar Assn., 58 Tenn. App. 636, 436 S.W.2d 296 (1968) and authorities cited therein.

▇▇▇ The sixth assignment of error is likewise unsupported by citation to the record and authorities as required by Rule 13 of the Rules of this Court, and may be considered as waived or abandoned, since there is no argument in support of same. There is evidence in the record to support the amount of damages awarded in each case, and said awards are not deemed excessive. Evidence of pecuniary damage or expectancy of beneficiaries is not an indispensible requisite for the award of substantial damages for wrongful death. Walkup v. Covington, 18 Tenn.App. 117, 73 S.W.2d 718 (1934). Potts v. Leigh, 15 Tenn.App. 1 (1931).

▇▇▇ The seventh assignment is likewise unsupported by citation to authorities or the record and may be considered waived. It is apparently based upon the testimony of one Cloward E. (not Thomas) Malloy, who was allowed to testify extensively about tires and tire safety but was not permitted to express an opinion of what would happen under the conditions in existence at the time and place of the collision. The ruling of the Trial Judge was based upon inadequate experiential knowledge of the witness regarding circumstances substantially identical to those in the present case. The ruling was well within the discretion reposed in Trial Judge regarding the testimony of experts. Thomas v. Harper, 53 Tenn.App. 549, 385 S.W.2d 130 (1964), Coppage v. Blackburn, 15 Tenn.App. 587 (1932); Foster & Creighton Co. v. Hale, 32 Tenn.App. 208, 222 S.W.2d 222 (1949).

The ninth assignment likewise is unsupported by citation as required by the Rules. Appellants' argument states that the recording in question was taken "during the early recovery of Tommy Bullington" and was not inconsistent with his personal testimony at the trial.

▇▇▇

▇▇▇ Tommy Bullington was and is a party to these suits. Any statement of a party, adverse to his contentions in the lawsuit, is admissible in evidence against him. Jones v. Lenoir City Car Works, 216 Tenn. 351, 392 S.W.2d 671 (1965). If the statement was self-serving, the party making it cannot complain because he is not prejudiced thereby.

Each assignment of error made by the appellants Bullington has been considered and none has been found to merit reversal.

The appellant, Rambo Motor Co., Inc., has filed the following assignments of error:

### I.

"The Court erred in finding in effect that the tires on the automobile rented by this defendant to Thomas H. Bullington were defective.

### II.

"The Court erred in finding in effect that this defendant was guilty of negligence in renting said automobile equipped with said tires and this was one of the proximate causes of the accident.

### III.

"The Court erred in rendering judgments in these cases against Rambo Motor Company, Inc., for the reasons hereinabove given in support of the foregoing assignments and for the further reason that (1) there was no evidence of the necessary causal connection between any negligence on the part of this defendant and the accident, (2) there is no evidence that more tread on the tires would have prevented the accident and the preponderance of the evidence is to the contrary, (3) any negligence on the part of the defendant was not a substantial factor in bringing about the accident and (4) the judgments against this de-

fendant are based upon conjecture, all as more particularly appears in our brief filed herewith."

Rambo points out that the only evidence of defective tires is the testimony of the witness Malloy who testified that he measured the thickness of the tire tread, or the depth of spaces in the tread of the rear tires of the Rambo vehicle; that the measurements were taken at the center and outside edges of the tread at three evenly spaced points around the perimeter of the tire; that the measurements on the left rear tire on the inside edge were all $\frac{4}{32}$ ($\frac{1}{8}$) inch, in the center all were $\frac{4}{32}$ ($\frac{1}{8}$) inch and on the outside edge from $\frac{5}{32}$ to $\frac{6}{32}$ inch; and that, on the right rear tire, the measurements on the inside edge were $\frac{3}{32}$ to $\frac{4}{32}$ inch, in the center $\frac{1}{32}$ to $\frac{2}{32}$ inch and on the outside edge $\frac{4}{32}$ to $\frac{5}{32}$ inch. Over objections of counsel, the following question and answer were allowed:

"Q. In the normal vehicle and normal travel, with the weight of the car and the type of car that you examined, what is the minimum tread that you would consider of safe travel?

A. My opinion is based on the tests that have been run by large firms as well as the individual and small tests that I have been involved in, and this establishes that a safety factor of, where once you reach a depth of $\frac{3}{32}$nds. of an inch, the tire becomes extremely dangerous under any abnormal condition.

Q. Under any abnormal condition?

A. Yes, sir..

Q. Dry road or wet road?

A. Wet road."

At another point the same witness testified:

"Q. Any tire worn to the point where less than $\frac{1}{16}$th. of an inch of tread design depth remains in any two tread grooves, exclusive of tire marks, at three locations, spaced approximately 120° apart around the tire circumference, starting at a location selected at random, or where any part of the ply or cord is exposed—do you agree with that statement? Is that the standard?

A. There are several standards. That, is only one standard. There is another standard that is almost identical to that, set up under the State Inspection Law of Georgia, that reads that any one place that it is under $\frac{1}{16}$th. of an inch.

Q. So you are disagreeing with the Rubber Manufacturers' Association?

A. Yes, sir.

Q. In their publication of Recommended Procedures of Safety Inspection and Operation Tires used on Passenger cars, station wagons, and multi-purpose passenger vehicles?

A. I disagree."

Another witness, McKay, testified without contradiction that the tires in question were "General Jet-Air Two" tires; that such tires have a special "center groove" which does not measure as deep as the "center groove" of other tires; that a special tire gauge is required to measure the depth of the tread of a General tire; that the tread thickness in the center of a General tire cannot be measured accurately by an ordinary tire gauge which does not take into account the peculiarity of a General tire; and that General tires have "safety bars" which are exposed when the tire needs to be replaced. Said witness also testified without contradiction as follows:

"Q. Yes, sir. Let's say we have got ice instead of water? Will a slick tire slide any more than a tread tire?

.     .     .     .     .     .

A. It would be practically no difference between a tire with tread and a slick—in fact, the American Rubber Manufacturer's Association says that a slick tire is safer on pure ice than a highway tire with a tread."

Rambo relies upon the quotation from Rubber Manufacturer's Association Recom-

mended Procedures for the Safety, Inspection and Operation of Tires Used on Passenger Cars, Station Wagons and Multipurpose Automobiles as printed in the 1971 Supplement of American Jurisprudence, Proof of Facts, Volume 171 as read to the witness, Malloy, supra. However, said witness did not adopt the contents of said quotation; it is not otherwise authenticated; and is not properly a part of the evidence.

The witness, Malloy, stated that in his opinion a tire should be replaced if the depth of the grooves in the tread measured $\frac{3}{32}$ inch or less. The Georgia Standards, as testified by said witness, requires replacement if any single measurement is under $\frac{1}{16}$ ($\frac{2}{32}$) inch. The witness also testified, "there are several standards."

From the testimony of the witness, Malloy, only one of the subject tires (the right) measured less than $\frac{3}{32}$ inch, and that only in the center of the tread. The outside of the tread of the right rear tire measured more than $\frac{3}{32}$ inch at all points. By the "Georgia Standard" the right tire should have been replaced because at one point the tire tread was $\frac{1}{32}$ inch too thin, even though the rest of the tread was of acceptable thickness.

The testimony of the witness, Malloy, cannot be accepted as the basis of liability of Rambo for a number of reasons.

The "personal opinion" of the witness is to be weighed in the light of his admission that there are "other standards," presumably at variance with his own "personal opinion," and that the safety standards of his own state are more lenient than his "personal opinion." There is no evidence that the "personal opinion" of said witness, or even the "Georgia Standard" is the prevailing standard in the area where Rambo does business.

The measurements were made by Malloy after the collision and after the vehicle had been towed to a place of storage. It can hardly be said that so minute a measurement was identical with the measurement which would have appeared upon an inspection prior to renting the vehicle several days previously. The use by the Bullington family prior to December 25, the initial part of the trip on December 25, the skidding, collision and towage back to the Rambo premises all were reasonably calculated to reduce the tread thickness some minute amount. Hence, it cannot reasonably be said that the measurement after the vehicle was returned to Rambo was a minutely accurate reflection of tread thickness when the vehicle was rented to Dr. Bullington. Furthermore, it would be unreal and unjust to penalize Rambo because their employee failed to find and measure the slight difference in thickness in the *center* of a tread that was of satisfactory thickness on its *outer edges*.

There is the further consideration of the inaccuracy of using an ordinary gauge to measure a General tire and the presence and use of "safety bars" as an indication of tread thickness without actual measurement.

There is another reason why fine distinctions and meticulous measurement should not be decisive herein. The testimony as to the importance of tread thickness is based upon the importance of tire treads on *wet* roads and the "hydroplane" effect on water. It is uncontroverted that no difficulty was experienced on the wet, "slushy" road prior to the collision. However, the skidding and collision occurred upon a frozen section of road. The precipitating condition was therefore ice, not water.

As to the action of tires on *ice*, the only evidence in the record is the uncontroverted testimony of Mr. McKay, supra, a tire dealer, that tread thickness was of no importance on ice. This is corroborated by the testimony of other motorists whose vehicles slid on the ice at the scene even though they were equipped with better tires. There is no showing that the collision would not have occurred if the tires in question had borne thicker tread.

Therefore, it has been determined that Rambo should not be held liable on two grounds; viz.:

(a) There is inadequate evidence to show that there was a defective tire or that Rambo was negligent in failing to detect a defect in the tires.

(b) If such a defect existed and if Rambo negligently failed to detect it, there is inadequate evidence to show that such defect was one of the proximate causes of the collision.

Accordingly, this Court must respectfully disagree with the Trial Judge as to his finding of fact and judgment against Rambo.

The plaintiffs-appellant, Thomas O. and Norma Wilkins Knight (hereafter referred to as the "Appellants-Knight") have filed the following assignments of error:

## I.

"The Court erred in entering a remittitur of Twenty Five Thousand ($25,000.00) Dollars; and

## II.

"The Court erred in considering the fact that no one was dependent on the deceased in assessing damages."

The memorandum opinion of the Trial Judge recites:

"And for the loss of life of Tommy Dewain Knight no monetary value can compensate for the loss of a human life. The record shows this young man to be an exceptional person. He had one year left in college and no one can say with any degree of accuracy or predict what he could have made or would have made or how long he would have lived, even though we do have certain guidelines. His parents were not dependent upon him, however, I have checked the various tables and some decisions allowing various amounts for loss of life where the person is not working and was approximately 21 or 22 years of age. I, therefore, give judgment for Mr. and Mrs. Knight in the amount of $75,000.00."

The first order overruling defendants' motion for a new trial recites:

". . . after more mature and deliberate consideration in the death case, the Court feels that he probably let his emotions weigh heavily in that case and finding that no one was dependant upon the young man that lost his life, the Court enters a remittitur of $25,000.00 in that particular case and all other motions, suggested remittiturs or additurs are herewith denied."

Thereafter, the plaintiffs' motion for a new trial was overruled by an order reciting:

"In this cause, after hearing the Motion of the Plaintiff, and the Amendment thereto, and after a full re-examination of the authorities cited in all of the briefs submitted, and a further examination of many of the decisions reported in *Michie* and *Tennessee Digest* on the pecuniary value of life, the Court feels that dollars cannot replace life, but under the criteria, this Court's mind and conscience is satisfied that $50,000.00 in this particular case for the wrongful death of young Mr. Knight is a proper award.

"In arriving at this decision, the Court was very much interested in the word 'pecuniary'; it merely means 'money.'

*"The Court did not take into consideration the fact that young Mr. Knight did not have any dependents, but from all of the other facts, his life expectancy and earning ability, of course, are speculative, and now being satisfied that I have reached a proper conclusion, the Motion of the Plaintiff and the Amendment thereto is hereby overruled . . . ."*

Thus it is seen that the Trial Judge expressly disclaimed being influenced by the lack of dependent relatives.

■ The deceased was a promising young college student; but, as observed by the Trial Judge, the estimation of compensation for wrongful death must take into consideration not only the most optimistic expectations of the future, but also the most pessimistic, and all the uncertainties between the extremes.

The burden of the argument of the appellants-Knight, is that $50,000.00 was too small an amount to allow for the death of a young man such as the deceased and that $75,000.00 would be a more appropriate amount. Appellants cite a long list of cases wherein various amounts have been awarded under various circumstances.

■ The estimation of damages for wrongful death, as for personal injury, pain and suffering, must necessarily be a fact-finding function wherein the finder-of-fact must first take into consideration all proper factors and then *estimate* the amount which will fairly compensate for the injury or loss.

■ There is no mathematical formula for computing damages in negligence cases. Templeton v. Quarles, 52 Tenn.App. 419, 374 S.W.2d 654 (1963).

■ While the amounts awarded in other cases may shed some light or furnish some guidance, in the end result, each case must be decided upon its own facts.

■ The review of the amount of a non-jury judgment for damages is governed by T.C.A. § 27–303. Therefore, there is a presumption that the amount of the judgment of the Trial Court is correct unless the evidence preponderates otherwise.

■ In the present case, this Court cannot say that the evidence preponderates otherwise, hence the amount of the judgment must be presumed correct and affirmed.

In each of these cases, the judgment against Thomas H. Bullington, Jr., and Thomas H. Bullington, Sr., is affirmed.

In each of these cases, the judgment against the defendant, Rambo Motor Company, Inc., is reversed and the suit against said defendant is dismissed.

One-half of the costs of the consolidated appeal will be taxed against the defendants Thomas H. Bullington, Jr., and Sr., and one-half of said costs will be taxed against the appellants, McKnight.

Affirmed in part.

Reversed and dismissed in part.

SHRIVER and PURYEAR, JJ., concur.