**Rodney Wayne BELLAMY, Sr.,
Plaintiff-Appellant,**

v.

**Barry SADLER, Defendant-Appellee.**

Court of Appeals of Tennessee,
Western Section, Sitting at Nashville.

June 23, 1982.

Application for Permission to Appeal
Denied by Supreme Court
Oct. 4, 1982.

John D. Kitch, Nashville, for plaintiff-appellant.

Joe P. Binkley and Patricia R. Young, Nashville, for defendant-appellee.

MATHERNE, Judge.

The plaintiff as administrator of the estate of Lee Emerson Bellamy, deceased, sues for damages due to the wrongful death of his decedent. The trial judge, sitting without a jury, gave judgment for $7,500.00 compensatory and $2,500.00 punitive damages. The plaintiff appeals insisting that the amounts awarded are excessively low and that the evidence preponderates against the amount of each award.

On December 1, 1978, at about 11:00 p.m., the defendant drew a pistol and shot Lee Emerson Bellamy in the head from about 15 feet away. Bellamy died about seven hours later. Bellamy was unarmed when he was shot, but the defendant placed a pistol in the front of a van in which Bellamy had been sitting to make it appear that Bellamy was armed. The defendant initially stated to the police that he shot Bellamy in self defense. Later, he changed that account of the incident and entered a plea of guilty to voluntary manslaughter. The defendant was sentenced to four to five years imprisonment, which sentence was suspended upon the defendant's serving about 21 days in jail.

The defendant had lived in Nashville for about seven years, and he had been in the

music business for about 15 years. The defendant had served as a green beret during the Viet Nam war and had written the song "Green Beret." The defendant was an expert in small arms and most forms of martial arts and combat. The decedent had been harassing the defendant and his girlfriend, Darlene Sharp, for several weeks. The defendant first met the decedent, who was known as Lee Emerson in the music industry, about three or four months prior to the fatal shooting. In September 1978 while the defendant was having a drink with Ms. Sharp and her father at the Hall of Fame Motor Inn on Music Row, Bellamy came into the lounge, slapped Ms. Sharp on the shoulder and said "Have you got my tapes, Bitch?" Ms. Sharp left the lounge with Bellamy to get the tapes from her automobile. The defendant followed, thinking that Ms. Sharp appeared frightened. Once outside the lounge Bellamy said to the defendant "Who the F do you think you are" to which the defendant replied "Anyone I choose to be." Bellamy then stated "Are you the green beret M_____ F_____?," came toward the defendant and raised his arm. At that point the defendant knocked Bellamy to the ground and told him to leave Ms. Sharp alone. Bellamy stood and stated "You tough S.O.B., I'll get you," "I'll blow you away, I've got friends who will take care of you."

From that time until the fatal shooting on December 1, 1978, the defendant received numerous telephone calls almost daily from Bellamy threatening the defendant's life. A Mr. Jack Powell testified that during this time he occupied an office that was formerly occupied by the defendant. Shortly before the day that Bellamy was shot, the front door of his office was thrown "violently open just like it was nearly ripped from the hinges" and Bellamy appeared with a cocked 38 caliber pistol in his hand. Bellamy was described as irrational, angry, screaming obscenities and apparently drunk or on drugs. Bellamy accused Powell of hiding the defendant and Powell had to reason with Bellamy quite some time before he would leave. Bellamy would call Ms. Sharp, threaten her and threaten the defendant. She passed the information on to the defendant.

On December 1, 1978, the defendant, Ms. Sharp and another couple were at the Natchez Trace Restaurant and Lounge. Ms. Sharp received a phone call which the defendant took for her—the caller was Bellamy. The defendant asked the bartender to call the police, but the police did not arrive. The defendant, Ms. Sharp and the other couple left the lounge and went to the apartment of Ms. Sharp for dinner. Later there was a knock on the door, but no one could be seen through the peephole of the door. The defendant went out a side door and saw Bellamy in his van. The defendant called for Bellamy to stop, Bellamy then came toward the defendant. The defendant stated that he saw a flash in Bellamy's hand and fired his pistol at Bellamy. The flash turned out to be Bellamy's car keys.

Bellamy was a white male, 51 years of age, occupied as a songwriter. The owner of Memory Music, the publishing company for which Bellamy wrote, testified that he considered Bellamy a good songwriter. Before coming with Memory Music, Bellamy had written the song "I Thought I Heard You Call My Name" which was a big hit. He considered Bellamy's work good and that he wrote several good songs. During the 18 months that Bellamy wrote exclusively for Memory Music, he was paid $24,439.57. This was paid in the form of advances against anticipated royalties, which is a common practice in the music industry.

The plaintiff insists that the above figures establish annual earnings of $15,600.00. Mortality tables showed a minimum of 19.5 years and a maximum of 24.01 years life expectancy. Using certain tables to get the present value of Bellamy's life the plaintiff claims the figure to be from $150,000.00 to $180,000.00, which he insists should be the amount of the judgment.

In an action for damages due to wrongful death the pecuniary value of the decedent's life is to be determined by evidence of the decedent's expectancy of life,

**22**

his age, condition of health and strength, capacity, if any, for labor and earning money through skill in any art, trade profession, occupation or business and his personal habits as to sobriety and industry. *Southern Railway Company v. Sloan,* (1965) 56 Tenn. App. 380, 407 S.W.2d 205.

■ Life expectancy tables, earnings and awards in other cases are helpful in the determination of the value of the decedent's life. However, these guides only shed some light on the subject, each case must be decided upon its own facts. In *Smith v. Bullington,* (Tenn.App.1973) 499 S.W.2d 649, the court stated:

> the estimation of compensation for wrongful death must take into consideration not only the most optimistic expectations of the future, but also the most pessimistic, and all of the uncertainties between the extremes.

■ There is evidence that Bellamy was on drugs to such an extent that he forged the name of a doctor on prescriptions. From the total evidence the trial judge could have concluded that Bellamy was a violent, dangerous person. We could also find that by his acts of threatening a former green beret with his life, going in search of him with a pistol, and harrassing him daily by telephone Bellamy did make a considerable contribution to his own demise. On the day of the fatal shooting Bellamy clearly asked for trouble by following the four people to Ms. Sharp's apartment. No one's life should be taken, and when a wrongful death is caused the party responsible must pay. However, in determining the amount all surrounding circumstances should be considered.

We conclude that the record establishes such circumstances that justify a very considerable reduction of the amount which would otherwise be proper. The trial judge apparently felt the same way and entered judgment accordingly. After a review of the record, we hold that the evidence does not preponderate against his judgment nor the amounts awarded.

The judgment of the trial court is affirmed, and this cause is remanded to that court for the enforcement thereof. The cost in this court is adjudged against the plaintiff-appellant for which execution may issue, if necessary.

NEARN and TOMLIN, JJ., concur.